David M. COHEN, Appellant,

v.

Raymond L. RAINS, Donald W. Moore, Al Curry, and Tim Curry, Appellees.

No. 2–87–115–CV.

Court of Appeals of Texas, Fort Worth.

April 27, 1989.

Robin Harrison, Miller, Keeton, Bristow & Brown, Houston, Jonathan Nelson, Fort Worth, for appellant.

Jim Lane, Lane, Lane, Ware & Bays, Joseph Colvin, Anne Gardner, Shannon, Gracey, Ratliff & Miller, Terry Gardner, Gardner & Kearney, H.G. Wells, Wells, Williford & Felber, Fort Worth, for appellees.

Before JOE SPURLOCK, II, FARRIS and HOPKINS (Retired, Sitting by Assignment), JJ.

## OPINION ON REHEARING

HOPKINS, Justice (Retired, Sitting by Assignment).

Motions for rehearing have been filed by appellant and by appellees. Although we deny both motions for rehearing, in order to clarify our prior holding in this case we hereby withdraw our opinion and judgment of November 23, 1988, and substitute this Opinion on Rehearing.

Appellant, David M. Cohen,[1] appeals from a judgment decreeing that he take nothing in his lawsuit seeking the principal balance of $355,480.45 due on a promissory note signed by appellees, and foreclosure of his security interest in and to 80,000 shares of common stock in Allied Auto Supply, Inc. Based upon a jury verdict that Cohen exercised ownership rights in the stock shares, the trial judge ruled in favor of appellees on their affirmative defense that Cohen was precluded from suing for the balance due on the note because his action in notifying appellees that he had voted the shares of stock amounted to a foreclosure of his security interest in full satisfaction of the debt under article nine of the Uniform Commercial Code.

The judgment is reversed and the cause is remanded to the trial court.

The parties are essentially in agreement as to the basic factual history of the case, which originated in January 1976. At that time, David M. Cohen agreed to sell the stock and assets of his auto parts supply business, Allied Auto Supply, Inc., to appellees. The sale of this closely held corporation was accomplished on March 12, 1976, by appellees' purchase of the 50,000 outstanding shares of Allied Auto Supply, Inc. stock owned by Cohen. The consideration given by appellees was: $20,000 paid; execution by all appellees of a promissory note in the principal amount of $533,600; and execution by appellees of a security agreement granting a security interest to Cohen in all of the corporation's common stock.

Later that year appellees re-incorporated Allied Auto Supply, Inc. as a Subchapter–S Corporation, and 80,000 shares of stock in the new corporation were issued (20,000 shares in the name of each of the four appellees). Simultaneously, Cohen released his security interest in the 50,000 shares of Allied Auto Supply, Inc.'s stock, and appellees pledged the inventory and other tangible property of the new corporation (also known as Allied Auto Supply,

---

1. At oral argument, this court was informed that Cohen died after this appeal was perfected. Nonetheless, this event does not affect the appellate process. *See* TEX.R.APP.P. 9(a).

Inc.—hereinafter "Allied") as security for the original March 12, 1976 promissory note.

On September 26, 1978, Cohen released his security interest in Allied's inventory and other tangible property, and accepted a third Security Agreement pursuant to which appellees granted Cohen a security interest in the 80,000 shares of Allied stock that had been issued in appellees' names when the new Subchapter–S Corporation was formed. The four stock certificates (one for each appellee—each stock certificate was for 20,000 shares) were retained by appellees and not delivered to Cohen at this time. Thereafter, appellees borrowed substantial sums from a bank and pledged the inventory, equipment, and other tangible assets as security for the debt.

In April 1983 appellees defaulted in their payments under the 1976 promissory note to Cohen. That same month, Cohen wrote to each appellee stating:

> Failure to receive current payments has placed your note in default.
>
> Unless remittance is received in full for the delinquency no later than Friday, April 29, 1983, I regret *no alternative exists but to file suit* to accelerate note to maturity. [Emphasis added.]

Cohen received no response to his letter.

On June 3, 1983 Cohen's attorney, Walter Zivley, wrote to each appellee on Cohen's behalf informing him that Cohen was accelerating the maturity of the note and demanding immediate payment.

During this period of time Allied was experiencing major financial difficulties, and on June 17, 1983 Gateway National Bank, the secured creditor holding the security interest in Allied's tangible assets, foreclosed upon this collateral. At that point appellee Rains, acting as president of Allied, wrote all creditors informing them of the foreclosure and the fact that appellees had "exhausted all possibilities to secure proper capitalization or to restructure the corporation's debt," and would be unable to meet its obligations to creditors.

On June 24, 1983, pursuant to Cohen's prior request,[2] appellees' attorney mailed the four stock certificates, representing appellees' ownership of the 80,000 shares of Allied stock, to Cohen's attorney. It is undisputed that appellees never endorsed the stock certificates, nor was Cohen ever given any instrument authorizing him to endorse the stock certificates or transfer ownership of the Allied stock from appellees to himself or to a third party.

On June 28, 1983 Cohen filed the instant lawsuit against appellees seeking payment of the unpaid principal sum ($355,480.45) under the promissory note, plus interest and attorneys' fees. Cohen also sought judicial foreclosure of the security interest held by him in the 80,000 shares of Allied's common stock. In this regard, Cohen requested that the judgment entered provide for the transfer of ownership of the stock "in the manner provided for under the bylaws of the corporation and the laws of the

---

**2.** On appeal Cohen claims the Security Agreement contemplates the secured party would physically possess the stock shares; Cohen relies upon the following language in the Security Agreement:

SECTION 2. DEBTOR'S WARRANTS AND COVENANTS.

....

C. That any and all of the securities, heretofore, now and hereafter pledged or delivered by Debtor to the Secured Party to secure the obligations to the Secured Party, shall be held and construed to be pledged hereunder as if fully described herein, and *will be held by said Secured Party* as security for any and all obligations of the Debtor to the Secured Party. [Emphasis added.]

....

SECTION 5. MISCELLANEOUS.

....

B. Secured Party may at any time deliver the Collateral or any part thereof to the Debtor and the receipt thereof by the Debtor shall be a complete and full acquitance [sic] for the property so delivered, and Secured Party shall thereafter be discharged from any liability or responsibility therefor.

....

F. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in his possession if he takes such action for that purpose as the Debtor requests in writing, and no failure of the Secured Party to preserve or protect any rights with respect to such Collateral against prior parties shall be deemed a failure to exercise reasonable care in the custody or preservation of such Collateral.

State of Texas." Cohen further asked that the judgment provide a definite date by which such transfer from appellees to Cohen shall be accomplished, and the court should also set a specific date on which such shares shall be sold by Cohen at public sale with the proceeds, if any, being credited against the amount of the judgment. On June 29, 1983, the day after filing suit, Cohen's attorney, Walter Zivley, wrote to Gateway National Bank and Allied, with a copy to each appellee, notifying them that Cohen had: elected to vote the shares of stock *"under the Security Agreement"* (emphasis added); removed appellees as officers and directors; elected himself president; and determined he would repudiate all transfer of assets made after June 28th unless made with his prior written consent. The entire text of the letter is set out below:

> On behalf of David M. Cohen, we do hereby notify you that he has heretofore *elected under the Security Agreement* covering 80,000 shares of the capital stock of Allied Auto Supply, Inc. *to vote such shares.* He has removed the officers and directors of Allied Auto Supply, Inc. who have heretofore served in such capacity and has elected himself as President of Allied Auto Supply, Inc. We would specifically notify you that no transfer of assets of Allied Auto Supply, Inc. in which you participate, directly or indirectly, made on or after June 28, 1983, will be valid or effective, without the prior written consent of Mr. Cohen. [Emphasis added.]

Zivley testified at trial that when he wrote this letter he was relying upon section 5A of the September 26, 1978 Security Agreement (the Security Agreement in effect at that time and at trial). In pertinent part, this document provides:

> SECTION 3. EVENTS OF DEFAULT.
>
> Debtor will be in default under this pledge agreement upon the happening of any of the following events or conditions (hereinafter called "Event of Default"):
>
> A. Debtor fails to pay when due any principal or interest owing under any of the obligations secured by the security interest created herein, or otherwise breaches any of the covenants, terms or conditions contained in any writings evidencing such obligations.
>
> ....
>
> SECTION 5. MISCELLANEOUS.
>
> A. It is agreed that the securities are pledged to the Secured Party solely for the purpose of Collateral, and that the *Debtor shall have the voting privileges which will continue unimpaired unless and until the Debtor commits an Event of Default* as set forth in the note or as defined herein. [Emphasis added.]

As is apparent, the Security Agreement does not specify whether the secured party, Cohen, must obtain judicial foreclosure of the stock prior to being able to vote the shares. There is nothing in the record indicating that prior to trial appellees challenged Cohen's right to vote the stock under the Security Agreement, or whether appellees just ignored the letter.

At trial, as their defense to Cohen's claim that they owed the balance of the promissory note, appellees pled that the Security Agreement did not provide for the voting of the stock prior to foreclosure by Cohen. Therefore, appellees contended that Cohen's action in notifying them that he had voted such stock and removed Allied's officers and directors was, in effect, a foreclosure, and Cohen thereby accepted such stock in full satisfaction of appellees' obligations, and Cohen was precluded from suing for any balance allegedly due under the promissory note. *See* TEX.BUS. & COM.CODE ANN. secs. 9.504 and 9.505 (Vernon Supp.1989).

Since the evidence presented was conclusive as to the execution of the note and Security Agreement, and as to the default and the unpaid balance owed by appellees, only two questions were submitted to the jury. These questions pertained to appellees' affirmative defense, and both were answered in appellees' favor:

QUESTION 1

Did Plaintiff on or before June 29, 1983, intend to, and did he, exercise the same or similar rights of ownership with

regard to the 80,000 shares of common stock of Allied Auto Supply, Inc., which a third party would have usually exercised if the stock had been owned by such a third party, other than Plaintiff or Defendants?

ANSWER: YES

(If you have answered QUESTION 1 "Yes", then and only in that event, then answer the following QUESTION)

QUESTION 2

Did Plaintiff notify Defendants before June 29, 1983, that he intended to exercise such ownership rights; if any?

ANSWER: NO

Based upon the jury's answers, the trial court entered judgment that Cohen take nothing.

Cohen raises three points of error contending: 1) the trial court erred in denying Cohen's motion for judgment notwithstanding the verdict because, as a matter of law, the actions described in Zivley's June 29, 1983 letter did not constitute a "disposition of collateral" pursuant to TEX.BUS. & COM.CODE ANN. sec. 9.504 (Vernon Supp. 1989); 2) Question 1 does not submit a controlling fact question; and 3) there is no evidence that the actions described in Zivley's letter caused any loss or harm to appellees.

The Uniform Commercial Code provides that unless otherwise agreed, upon default a secured party has the right to take possession of the collateral. TEX.BUS. & COM.CODE ANN. sec. 9.503 (Vernon Supp. 1989). Section 9.504 of the U.C.C. specifies that a secured party after default may sell, lease or otherwise dispose of the collateral by public or private proceedings; if the notice requirements of this statute are met, the secured party may then seek a deficiency judgment against the debtor. TEX. BUS. & COM.CODE ANN. sec. 9.504. There is no evidence Cohen either sold or leased the collateral; however, appellees contend that the letter of June 29th advising them the stock had been voted, and appellees' removal as officers, constituted a foreclosure and disposition of the collateral (presumably from Cohen as pledgee-creditor to Cohen as owner). We note that appellees have provided us with no authority with similar facts in support of their contention, nor have we been able to find any.

Another alternative available to a creditor is stated in section 9.505 of the Code, which provides that "a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor if he has not signed after default a statement renouncing or modifying his rights under this subsection." TEX.BUS. & COM.CODE ANN. sec. 9.505(b) (Vernon Supp.1989). It is undisputed that Cohen did not give written notice of a proposal to retain the stock in satisfaction of the debt, and there was no evidence of appellees requesting that Cohen accept the stock in satisfaction of the debt. Appellees contend that the action recited in the letter constituted a foreclosure and retention of the stock in violation of section 9.505. Again, no authority was cited and none has been found that would support appellees' contention in this regard.

Section 9.501(a) of the U.C.C. states that "[w]hen a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this subchapter and except as limited by Subsection (c) those provided in the security agreement. *He may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure.*" TEX.BUS. & COM. CODE ANN. sec. 9.501(a) (Vernon Supp. 1989) (emphasis added). The rights and remedies referred to in subsection (a) are cumulative. *Id.*[3] Therefore, when a debt-

3. The Official Comment to this Code section provides that "a secured party is entitled to reduce his claim to judgment or to foreclose his interest by any available procedure, outside this Article, which state law may provide." TEX. BUS. & COM.CODE ANN. sec. 9.501 comment 6 (Tex.UCC) (Vernon Supp.1989). As one court has stated:

One legal writer states the change in this language: "It would seem that the purpose of

or is in default a secured party is not required to elect which of these rights he wishes to pursue—he "may take any permitted action or combination of actions." *Hubbard v. Lagow*, 576 S.W.2d 163, 165 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.). If the collateral is in the secured party's possession, that party must use reasonable care in the custody and preservation of the collateral, including taking necessary steps to preserve rights against prior parties. TEX.BUS. & COM.CODE ANN. sec. 9.207(a) (Vernon Supp.1989).

Except in answer to appellees' pleading of an affirmative defense, Cohen did not specifically seek relief under the U.C.C. Appellees' affirmative defense brought into consideration Cohen's rights under the U.C.C., thus requiring the trial court and this court to examine the propriety of Cohen's actions in seeking judicial foreclosure and a deficiency judgment.

■ The Texas Supreme Court has held there is no provision within section 9.505 allowing a creditor to sue for a deficiency after he retains the collateral. *Tanenbaum v. Economics Laboratory, Inc.*, 628 S.W.2d 769, 771 (Tex.1982). The court opined that "the intent of the Legislature in enacting these provisions of the Texas Business and Commerce Code was to put the creditor to an election to either sell the repossessed collateral pursuant to Section 9.504 or to retain the collateral in complete satisfaction of the debt pursuant to Section 9.505." *Id.* at 771–72. Therefore, if Cohen was found to have retained the collateral under section 9.505 he is precluded from recovering a deficiency judgment. *See id.* It should be noted that in *Tanenbaum* there was no suit for judicial foreclosure of a security interest.

On appeal, Cohen argues that because he had no authority or means to actually transfer ownership of the certificates from appellees to a third party, nor could he vest ownership in himself without judicial foreclosure, his physical possession of the stock certificates and assertion that he had exercised voting rights under the terms of the Security Agreement, was not a disposition or a retention of the collateral in satisfaction of the obligation. Cohen also asserts that section 5A of the Security Agreement permitted him to vote the stock shares as a creditor after default, but if he was mistaken in this regard and was not so authorized, the result was that the attempted vote without previous judicial foreclosure was invalid, and therefore there was never any disposition or retention of the collateral by him, and no harm done to appellees.

In his second point of error, Cohen alleges that the first question submitted to the jury was not a controlling question, and the court should have submitted the case as requested by Cohen.[4] Cohen tendered four jury questions, inquiring: 1) whether Cohen sold or otherwise disposed of the Allied

---

the Code is quite clear, namely, to abolish the doctrine of election of remedies when a security interest is enforced. The secured party is entitled to only one satisfaction, but he may seek it in a number of ways, even though they may presently be considered inconsistent." Loiseaux: *Default Proceedings Under the Texas Uniform Commercial Code,* 44 Texas L.Rev. 702, 711 (1966).

Although the Code permits foreclosure by any available judicial procedure and most pre-Code foreclosure law still applies, the Code has abandoned the "election of remedies" doctrine which existed under pre-Code law. 51 Tex.Jur.2d, Part 2, *Secured Transactions,* sec. 296 (1970). The broader choices of remedies, however, will not allow the secured party to harass the debtor. White & Summers: *Uniform Commercial Code,* p. 965 (1972).

*Hubbard v. Lagow,* 576 S.W.2d 163, 165 (Tex. Civ.App.—Austin 1979, writ ref'd n.r.e.).

4. Since the facts as to execution of the note, default and now payment of the balance owed were not in dispute at the time of trial, the only matter preventing Cohen from obtaining an instructed verdict was the question raised by appellees' affirmative defense; i.e., that the voting or attempted voting of the shares of stock constituted a bar to a deficiency judgment under the provisions of the U.C.C. Cohen did not have the burden of submitting questions supporting appellees' affirmative defense, to be included in the court's charge. Cohen, in order to preserve error for appellate review, only had to voice proper objections to the court's charge. However, Cohen went further than the rules required and did suggest certain questions to be submitted by the court, in addition to voicing his objection that the questions submitted were not controlling issues to be determined by the jury.

stock after receiving the stock certificates from appellees; 2) whether Cohen intended to accept the Allied stock as payment for, or in satisfaction of, appellees' indebtedness to him after the stock certificates were delivered to him by appellees; 3) whether Cohen acted in a reasonable manner by not attempting to sell the Allied stock after the certificates were delivered to him; and 4) the amount of loss caused to appellees by the fact that Cohen did not attempt to sell the Allied stock.

Appellees affirmatively pled that the Security Agreement did not provide for the voting, prior to foreclosure of the stock collateral by the secured party, and that Cohen's actions in voting the stock and removing the officers and directors of the corporation amounted to a foreclosure; therefore, appellees alleged Cohen accepted such stock in full satisfaction of appellees' obligations. Appellees claim on appeal that because Cohen failed to give them notice of his intention to take these actions, Cohen either: 1) "disposed" of the collateral under section 9.504 and is deemed to have impliedly retained the collateral pursuant to section 9.505 in complete satisfaction of the debt; or 2) has impliedly elected to "retain" the collateral as provided by section 9.505.

In response to Cohen's contentions, appellees appear to assert that Question 1 was properly worded so as to submit to the jury appellees' defense under either section 9.504 (sale or disposition), or section 9.505 (implied retention).[5] We will first consider whether Question 1 was sufficient under section 9.505.

■ The issue confronting us is: if a secured creditor never proposes in writing to retain the collateral pursuant to section 9.505, can the creditor nevertheless be held to have retained the collateral in full satisfaction of the debtor's obligation? If so, how should the jury be charged? This concept of "involuntary strict foreclosure"[6] has never specifically been addressed in Texas. (As discussed in detail herein, although the Texas Supreme Court in *Tanenbaum* speaks of retention under 9.505, the facts of that case clearly indicate a *disposition* by destruction without notice under *9.504*.) The version of section 9.505 in force at the time of this transaction tracked the language of U.C.C. sec. 9–505, 3A U.L.A. 358 (1981) in all important respects. Thus, we look for guidance to the decisions of other jurisdictions that have decided this issue by applying their own statutes enacting U.C.C. section 9–505. *See United States v. Whitehouse Plastics*, 501 F.2d 692, 694–95 (5th Cir.1974), *cert. denied*, 421 U.S. 912, 95 S.Ct. 1566, 43 L.Ed.2d 777 (1975).

Other states appear to adhere to three different approaches.[7] Some courts have held that an election under section 9.505 is impossible absent the actual service of notice on the debtor of the secured party's intent to retain the collateral in payment of the debt. *See Chrysler Credit Corp. v. Mitchell*, 94 A.D.2d 971, 464 N.Y.S.2d 96, 97 (N.Y.App.Div. 4th Dept.1983), *citing S.M. Flickinger Co., Inc. v. 18 Genesee Corp.*, 71 A.D.2d 382, 423 N.Y.S.2d 73 (N.Y.App.Div. 4th Dept.1978); *Stensel v. Stensel*, 63 Ill.App.3d 639, 20 Ill.Dec. 548, 551, 380 N.E.2d 526, 529 (Ill.App.Ct. 4th Dist.1978).

The other two methods by which courts have addressed this issue both emphasize there may be circumstances in which strict

---

5. The record reflects that appellees stated they had no objections to the court's charge, and there is no indication they tendered any requested jury questions regarding their affirmative defense. Cohen's brief makes the statement that Question 1 "submitted by the trial judge was apparently his own creation, as it bears no resemblance to the issues proposed by the parties prior to trial." Since this statement has not been challenged by appellees, *see* TEX.R.APP.P. 74(f), we accept it as correct.

6. *See,* Barkley Clark, *The Law of Secured Transactions Under the Uniform Commercial Code,* (1980 & Supp.1988); and James J. White & Robert S. Summers, *Uniform Commercial Code,* 1104–08 (1980).

7. *See generally,* Annotation, *Construction and Operation of UCC sec. 9.505(2) Authorizing Secured Party in Possession of Collateral to Retain it in Satisfaction of Obligation,* 55 A.L.R.3d 651 (1974 and Supp.1988); and W. Mike Baggett, *Texas Foreclosure Law & Practice,* 807–10 (1984).

compliance with the written notice provisions of section 9.505 is not essential to a claim that the secured party has retained the collateral in satisfaction of the debt. Some courts have held that an election can be implied from an unreasonably prolonged retention of the collateral by the secured party, and that the determination of what constitutes an unreasonable period of time is a question for the trier of fact. *See Moran v. Holman*, 514 P.2d 817, 820–21 (Alaska 1973); *Shultz v. Delaware Trust Company*, 360 A.2d 576, 578–79 (Del.Super.Ct.1976); *Millican v. Turner*, 503 So.2d 289, 291 (Miss.1987), *citing Service Chevrolet, Inc. v. Sparks*, 99 Wash.2d 199, 660 P.2d 760, 763 (1983); *Swanson v. May*, 40 Wash.App. 148, 697 P.2d 1013, 1015–16 (1985).

The third approach to this problem requires that the secured party, by his actions, manifest an intent to retain the collateral in satisfaction of the obligation. *See Nelson v. Armstrong*, 99 Idaho 422, 582 P.2d 1100, 1108 (1978); *Wisconics Engineering, Inc. v. Fisher*, 466 N.E.2d 745, 762–63 (Ind.Ct.App. 2nd Dist.1984); *Jones v. Morgan*, 58 Mich.App. 455, 228 N.W.2d 419, 423 (1975); *First Nat. Bank of Pennsylvania v. Cole*, 291 Pa.Super. 391, 435 A.2d 1283, 1284 (1980).[8]

The landmark Texas case dealing with sections 9.504 and 9.505 is *Tanenbaum v. Economics Laboratory, Inc.*, 628 S.W.2d 769 (Tex.1982). The issue in *Tanenbaum* was whether the *destruction* of collateral in a secured transaction, without notice to the debtor, barred a suit for deficiency. *Id.* at 770 (our emphasis). In *Tanenbaum*, the debtor requested that the secured creditor take possession of the collateral and credit the debtor's account in full. *Id.* The creditor took possession of the collateral, and after deciding it was not economically feasible to repair the collateral, scrapped it; the debtor was not given notice of the creditor's intention to dispose of the collateral. *Id.* The creditor then brought suit for the balance due on the debt, minus the scrap value of the collateral. *Id.* The Texas

Supreme Court discussed the applicability of sections 9.504 and 9.505 and stated there is no provision within section 9.505 allowing the creditor to sue for a deficiency after he retains the collateral. *Id.* at 771. The court opined that the legislative intent of these two Code provisions was to put the creditor to an election to either sell the repossessed collateral, or retain it in complete satisfaction of the debt. *Id.* at 771–72. The court then held that in order for a creditor in a secured transaction to sue for a deficiency after disposition of collateral in a commercially reasonable manner, the creditor must first comply with the notice provisions of section 9.504. *Id.* at 772. Lastly, the court determined that because the creditor in *Tanenbaum* destroyed the collateral, the creditor was deemed to have retained the collateral in full satisfaction of the indebtedness, thereby electing to be governed by section 9.505; and since a deficiency judgment was not provided for in section 9.505, this creditor was not entitled to a deficiency judgment. *Id.*

In light of the court's holding in *Tanenbaum* that non-compliance with the notice requirement of section 9.504 prior to disposition by destruction results in an implied retention of the collateral in full satisfaction of the indebtedness pursuant to section 9.505, it would seem that Texas does not adhere to the first viewpoint discussed earlier—that an implied election to retain the collateral pursuant to section 9.505 is possible only upon service of notice on the debtor.

A case with facts analogous to those before us is *Wisconics Engineering, Inc. v. Fisher*, 466 N.E.2d 745 (Ind.Ct.App.2nd Dist.1984). In *Wisconics*, the debtor purchased the corporation, Fisher Engineering, Inc., and pledged all the outstanding stock shares of that corporation as collateral for the purchase money note. *Id.* at 748–49. Although the creditor was to hold the stock shares as security for the note indebtedness, the debtor was to retain voting rights to the shares except in the event

---

**8.** For a further discussion of these three viewpoints, *see Schmode's, Inc. v. Wilkinson*, 219 Neb. 209, 361 N.W.2d 557, 558–59 (1985).

of default upon the note. The security agreement was silent as to whether, upon default, the right to vote the stock vested in the creditor. The debtor subsequently defaulted and the creditor: elected to vote the stock; installed himself as president; resumed control of the corporation; and denied debtor access to the corporate offices, property and records. *Id.* at 749–50. When the creditor sought a deficiency judgment on the note, the debtor argued that the creditor had elected to retain the stock collateral in full satisfaction of the remaining note indebtedness pursuant to section 9.505 of the U.C.C., notwithstanding that the creditor never proposed that he was retaining the stock collateral in satisfaction of the debtor's obligation. *Id.* at 763.

*Wisconics* was an appeal from an interlocutory summary judgment; the appellate court reversed and remanded the case for a determination of several material issues, all related to whether the creditor's conduct in voting the stock and retaining it for one and one-half years could be construed as a manifestation of his intent to retain the stock in satisfaction of the debt. *Id.* at 764–66.

In the case at bar, Cohen objected to the two questions in the court's proposed charge; specifically, he argued that the first question did not inquire about any controlling issue in the case. Further, Cohen tendered requested jury questions inquiring whether he intended to accept the stock in satisfaction of appellees' indebtedness, and whether he acted in a reasonable manner by not attempting to sell the stock after the certificates were delivered to him. Basically, these two requested questions represent the second and third approaches that other states have utilized when dealing with section 9.505. Question 1 submitted by the trial court in the instant case bore no resemblance to either of these approaches, and the Texas Supreme Court's holding in *Tanenbaum* leaves unanswered the question as to which of the two approaches Texas courts are to follow in determining whether there has been an implied voluntary retention.

We are of the opinion that the "exercise of ownership rights" is not necessarily synonymous with "retention" in satisfaction of debt under section 9.505. The controlling question under the record of this case as it relates to section 9.505 was whether Cohen's actions constituted a retention of the collateral by him in complete satisfaction of the debt. This would permit the jury to consider whether Cohen's actions in notifying appellees he had voted the stock and removed the officers, and in not subsequently selling the stock, manifested an intention by him to retain the collateral in complete satisfaction of the debt under section 9.505. The right to vote stock may be *one* incident of ownership; for a pledgee to exercise such voting right would not necessarily constitute a disposition or retention of the collateral itself, but may be *one* fact issue to be evaluated by the jury in arriving at its determination of the controlling issue, i.e., disposition or retention. We have found no provision within the U.C.C. requiring that notice be given prior to exercising voting rights, and no such contention is made by appellees.

We hold that Question 1 submitted by the trial court was not properly worded so as to submit appellees' affirmative defense under section 9.505, and that Cohen has preserved his error in this regard.

We are next faced with appellees' claim that Question 1 adequately presented their affirmative defense under section 9.504—i.e., that Cohen sold, leased or otherwise disposed of the collateral. Cohen claims he was entitled to judgment as a matter of law in this regard. In his first point of error, Cohen contends the trial court erred in denying his motion for judgment non obstante veredicto. In this motion Cohen asserted that as a matter of law the actions described in his June 29, 1983 letter did not constitute a "disposition of collateral" governed by section 9.504 of the Code. Failure to grant a motion for judgment n.o.v. is a "no evidence" point. *Southwestern Bell Tel. Co. v. Sims,* 615 S.W.2d 858, 861 (Tex. Civ.App.—Houston [1st Dist.] 1981, no writ); *see also Chemical Cleaning, Inc. v. Chemical Cleaning & Equipment Service, Inc.,* 462 S.W.2d 276, 277 (Tex.1970) (per

curiam). This point should be sustained when the evidence establishes conclusively the opposite of a vital fact. *See Commonwealth Lloyd's Ins. Co. v. Thomas,* 678 S.W.2d 278, 288 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.).

TEX.R.CIV.P. 301 provides that "the court may render judgment non obstante veredicto if a directed verdict would have been proper." A directed verdict is proper only under limited circumstances, i.e.: 1) a defect (specifically indicated) in the opponent's pleading makes it insufficient to support a judgment; 2) the evidence proves conclusively the truth of fact propositions which, under the substantive law, establish the right of the movant, or negative the right of his opponent, to judgment; or 3) the evidence is insufficient to raise an issue of fact as to one or more fact propositions which must be established for the opponent to be entitled to judgment. *McCarley v. Hopkins,* 687 S.W.2d 510, 512 (Tex.App.—Houston [1st Dist.] 1985, no writ); *Rowland v. City of Corpus Christi,* 620 S.W.2d 930, 932–33 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.); and *Ottis v. Haas,* 569 S.W.2d 508, 512 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.).

Cohen asserts he is entitled to judgment as a matter of law for two reasons. First, he maintains that section 5A of the Security Agreement permitted him to take the actions described in his June 29, 1983 letter. Therefore, these actions may not be considered a "disposition" of the collateral under section 9.504. Second, Cohen contends a "disposition" can only be made to a third party, and it is undisputed Cohen did not transfer possession or ownership in the stock shares to a third party.

■ We will first address Cohen's theory that the Security Agreement gave him the right to vote the stock shares. In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). If there is no ambiguity in an instrument, its construction is a question of law for the court. *Westwind Exploration v. Homestate Sav. Ass'n,* 696 S.W.2d 378, 381 (Tex.1985). Mere disagreement over the interpretation of an instrument does not make it ambiguous. *Sun Oil (Delaware) v. Madeley,* 626 S.W.2d 726, 727 (Tex.1981); *Maxwell v. Lake,* 674 S.W.2d 795, 801 (Tex.App.—Dallas 1984, no writ). A contract is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. *Coker,* 650 S.W.2d at 393; *R & P Enterprises v. LaGuarta, Gavrel & Kirk,* 596 S.W.2d 517, 519 (Tex.1980). In determining whether a contract is ambiguous, the trial court considers the wording of the instrument and if a question relating to its meaning is presented, the court is to take the wording of the instrument, consider the same in light of the surrounding circumstances, apply the pertinent rules of contract construction thereto, and thus settle the meaning of the contract. *Aetna Life & Cas. Co. v. Gunn,* 628 S.W.2d 758, 760 (Tex.1982), *citing City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515 (Tex.1968). Interpretation of a contract becomes a fact issue, to be resolved by extrinsic evidence, only when application of pertinent rules of construction leaves a genuine uncertainty as to which of two meanings is proper. *Coker,* 650 S.W.2d at 394; *Harris v. Rowe,* 593 S.W.2d 303, 306 (Tex.1979).

■ The pertinent paragraph of the Security Agreement in the instant case provides as follows:

A. It is agreed that the securities are pledged to the Secured Party solely for the purpose of Collateral, and that the Debtor shall have the voting privileges which will continue unimpaired unless and until the Debtor commits an Event of Default as set forth in the note or defined herein.

As is evident, the Security Agreement did not specifically state whether Cohen, as Secured Party, may vote the stock upon appellees' default.

The initial determination of whether the Security Agreement is ambiguous is a question of law for the trial court, *see Westwind,* 696 S.W.2d at 381; however, the record does not reflect the trial court's

decision on this issue. In order for Cohen to be entitled to judgment as a matter of law under section 9.504, the Security Agreement would have to be interpreted to be unambiguous and allow Cohen the right to vote the stock shares upon appellees' default. After reviewing the Security Agreement in light of the surrounding circumstances, we do not find the provision in question to be unambiguous,[9] and we hold that Cohen did not as a matter of law have the right under the Security Agreement to vote the stock shares in the event of appellees' default. Accordingly, the trial court properly denied Cohen's motion for judgment non obstante veredicto on this theory.

In his same point of error, Cohen also maintains that because he did not transfer ownership or possession of the collateral to a third party, as a matter of law a sale or other "disposition" of the collateral could not have occurred; therefore, this fact situation is not governed by the notice requirements of section 9.504 and the holding in *Tanenbaum,* and judgment n.o.v. should have been rendered in his favor. Cohen's argument is that he was legally unable to transfer title inasmuch as the stock certificates had never been endorsed by appellees to effect a transfer of ownership of the stock to Cohen, and appellees never gave him a stock power instrument that would enable Cohen to sell the stock to a third party.[10] We will address this issue in conjunction with our determination as to whether Question 1 will support a judgment for appellees pursuant to an affirmative defense under section 9.504.

As discussed earlier in this opinion, the trial court asked the jury whether Cohen "intended to, and did he, exercise the same or similar rights of ownership with regard to the 80,000 shares of the common stock of Allied Auto Supply, Inc., which a third party would have usually exercised if the stock had been owned by such a third par-

ty, other than Plaintiff or Defendants?" Cohen objected to Question 1 stating that it did not submit a controlling issue, and tendered the following proposed question and instruction:

> Do you find from a preponderance of the evidence that David M. Cohen sold or otherwise disposed of the 80,000 shares of Allied Auto Supply, Inc. stock after receiving the stock certificates from Defendants?
>
> Answer: "He did sell or dispose of the stock," or "He did not sell or dispose of the stock."
>
> ANSWER: _____
>
> *Instruction:* You are instructed that, to find a disposition of the Allied Auto Supply, Inc. stock, you must find that Mr. Cohen transferred ownership or possession of the stock to a third party. A transfer of possession or ownership of the stock to Mr. Cohen is not a disposition of the stock.

Cohen's argument regarding appellees' affirmative defense under section 9.504 may be summarized thusly:

(1) There must be a sale or disposition for *Tanenbaum* to apply; the initial burden to plead and prove this is upon the debtor claiming the affirmative defense.

(2) Every case following *Tanenbaum* that bars a creditor's claim because of lack of notice under section 9.504 involves a sale or transfer of possession *to a third party.*

(3) Mere assumption of ownership ("exercise of ownership rights that a third party would have usually exercised") does *not* constitute a sale or disposition under section 9.504, and the trial court should have submitted the jury question tendered by Cohen.

(4) Even if Cohen's actions in voting the stock constituted exercise of ownership rights, appellees still were required to ob-

---

**9.** We note that if the trial court determined the Security Agreement to be ambiguous, the court should then have submitted a question to the jury regarding Cohen's alleged right to vote the stock shares under the provisions of the Security Agreement. The record does not reflect that either party requested a jury question concerning this matter.

**10.** A stock power instrument is a form of assignment of share certificates, separate from the certificate. *Fletcher v. Cobuzzi,* 499 F.Supp. 694, 696 (W.D.Pa.1980).

tain a jury finding that Cohen sold or otherwise disposed of the collateral.

Appellees, on the other hand, urge that exercise of ownership rights inconsistent with those of the debtor is synonymous with a disposition under section 9.504. They maintain that Cohen's proposed jury charge regarding "disposition" was properly refused because it asked an undisputed fact (Cohen did not transfer ownership or possession to a third party), and the instruction was legally incorrect (transfer to a third party is not the criteria). Appellees' contention that Question 1 is proper under section 9.504 is premised upon the reasoning that: a shareholder whose shares are pledged shall be entitled to vote such shares until the shares have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote the shares so transferred, *see* TEX. BUS.CORP. ACT ANN. art. 2.29 H (Vernon 1980). Appellees further contend that when Cohen voted the stock shares he could only do so by asserting ownership rights in the collateral inasmuch as only an owner can vote the stock.[11] Therefore, appellees claim Cohen's exercise of ownership rights was equivalent to a "disposition" of the collateral, and Question 1 was properly worded so as to submit appellees' defense under section 9.504. We do not interpret the authorities cited by appellees as support for their argument that the wording of Question 1 inquiring about Cohen's exercise of ownership rights was a controlling issue pursuant to this Code section.

Regarding his theory that the controlling question for the jury was whether Cohen "disposed" of the collateral, Cohen relies primarily upon *First City Bank—Farmers Branch, Tex. v. Guex*, 677 S.W.2d 25, 29 (Tex.1984) and *Fletcher v. Cobuzzi*, 499 F.Supp. 694, 698 (W.D.Pa.1980). In *Guex*, the secured creditor took possession of the collateral (a boat and trailer) and released it to a third party; when the debtor later recovered the collateral from the third party it was in a damaged condition. *Guex*, 677 S.W.2d at 27. The debtor then sued the secured party for damages under TEX.

BUS. & COM.CODE ANN. sec. 9.507 (Vernon 1968), claiming the secured creditor had disposed of the collateral in a commercially unreasonable manner. The creditor defended by asserting that no disposition of the collateral had occurred within the meaning of section 9.504 because there was no actual sale or transfer of title of the collateral to the third party. *Guex*, 677 S.W.2d at 28. In response to the secured creditor's argument that "disposition" meant sale and actual transfer of title, the court stated:

> Although not speaking directly to what constitutes a "disposition," this court, in *Tanenbaum v. Economics Laboratory, Inc.*, 628 S.W.2d 769, 771 (Tex.1982), held that the destruction of the collateral by the creditor was a disposition entitling the debtor to notice. Moreover, the very language of Tex.Bus. & Com.Code section 9.504(c) states that disposition of the collateral may be "by public or private proceedings" and "at any time and place and on any terms." The transactions between the bank and Kaprielian [the third party] constituted proceedings on any terms. Kaprielian took possession of the boat. The bank took her promissory note and received her check for past-due installments, repossession charges, and late charges. [The bank subsequently returned her check and voided the entire transaction to Kaprielian.] *Whether title to the boat and trailer were vested in Kaprielian is immaterial. A disposition occurred.* Our conclusion is again reinforced by the language of the statute itself. Had the legislature intended the meaning urged by the bank, they would have omitted "or otherwise dispose" after "sell" and "lease."

*Id.* (emphasis added). In *Guex*, the secured creditor also argued that no evidence existed to support the jury's finding that a disposition occurred. *Id.* The trial court had instructed the jury in conjunction with the disposition issue as follows:

> The bank shall be deemed to have 'DISPOSED OF THE COLLATERAL' if it delivered possession or custody of the

---

**11.** This is not uniformly correct—a pledgee can vote if given that right.

boat and trailer to Mary Ann Kaprelain (sic) with the intention of investing her with such proprietary interest in the boat and trailer as to enable her to retain them in her possession for a period of time or permanently.

*Id.* at 29. There were *no objections* by the secured party to the court's charge in *Guex;* therefore, the supreme court did not consider the correctness of the instruction, but merely held that there was more than a scintilla of evidence to support the jury finding that the secured creditor had disposed of the collateral to a third party. *Id.* at 28–29.

In *Fletcher*, the secured creditor was seeking to establish ownership of the stock/collateral and argued that by transferring the stock into his name, he had actually made a disposition to himself under section 9.504. *Fletcher*, 499 F.Supp. at 698. The court stated:

> *Disposition is not defined by the Code, but a mere transfer of names would not appear to be within the meaning of the language of the statute,* i.e. "sold, leased, or otherwise disposed of." The connotation carried is of some assignment for value of the creditor's rights to the collateral, and the transfer of title to the creditor would not be such an assignment.
>
> Rather, it is more akin to repossession, a perfection of the creditor's rights to the collateral. Defendant's transfer was merely a means of eliminating plaintiff's legal title to the collateral, and vesting such title in himself. A parallel may be seen in the repossession of tangible property, vesting ownership in the creditor prior to disposition. *Thus, a transfer of title by the creditor to himself will not operate as a foreclosure under the Code.*

*Id.* at 698–99 (emphasis added).

■ We agree with appellees in the case at bar that any requirement in Texas

that there must be "some assignment for value of the creditor's rights to the collateral," as stated in *Fletcher, id.,* has been eliminated by our supreme court in *Tanenbaum* where the court held that sections 9.504 and 9.505 applied even though the collateral was deemed nearly worthless and had been destroyed. *See Tanenbaum,* 628 S.W.2d at 772. The holding in *Tanenbaum* was simply that a destruction of property was a disposition of property, and that since no notice of disposition had been previously given, the creditor was deemed to have retained possession of the property in satisfaction of the debt, and that such retention precluded a deficiency judgment under the provisions of section 9.505. We are of the opinion that the holding in *Tanenbaum* should not be extended so as to govern the facts of this case. Having thoroughly considered this matter, we are of the opinion that "exercise of ownership rights" is not necessarily synonymous with a "disposition" or "transfer" under section 9.504. Therefore, we find that Question 1 in the case before us does not submit a controlling fact question under this Code section.

We hold Question 1 was not a controlling fact question and will not support a judgment for appellees under either section 9.504 or 9.505 of the U.C.C. Cohen's second point of error is sustained.

■ With regard to Cohen's contention that he was entitled to judgment as a matter of law because there was no disposition to a *third party,* we disagree that Texas case law has limited a "disposition" under section 9.504 to this extent. Although Cohen cites numerous cases involving factual situations where there was an alleged disposition to a third party,[12] a reading of these cases leads us to conclude that the courts have not interpreted *Tanenbaum* so

---

12. *See Hernandez v. Bexar County Nat. Bank,* 710 S.W.2d 684 (Tex.App.—Corpus Christi 1986, no writ) (creditor released repossessed automobiles to one guarantor who then sold them to a third party); *Peck v. Mack Trucks, Inc.,* 704 S.W.2d 583 (Tex.App.—Austin 1986, no writ) (per curiam) (creditor repossessed tractors and sold them); *Burton v. National Bank of Commerce of Dallas,* 679 S.W.2d 115 (Tex.App.—Dallas 1984, no writ) (creditor repossessed and sold truck, apparently to a third party); *Gentry v. Highlands State Bank,* 633 S.W.2d 590 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd) (creditor sold the repossessed inventory at a public sale).

as to *require* that a disposition under section 9.504 must be to a third party. In fact, in *Tanenbaum* the collateral was *not* disposed of to a third party, but was actually destroyed *by the secured creditor. See Tanenbaum*, 628 S.W.2d at 770.

■ We hold that whether the actions described in Cohen's June 29, 1983 letter constituted a disposition of collateral under section 9.504 was a question of fact for the jury to determine. Accordingly, the trial court did not err in denying Cohen's motion for judgment non obstante veredicto concerning this issue. Cohen's first point of error is overruled.

In his last point of error, Cohen urges the trial court erred in entering a take nothing judgment, asserting there is no evidence the actions described in his June 29, 1983 letter caused any loss or harm to appellees. In view of our holding that Question 1 will not support a judgment in favor of appellees, we deem it unnecessary to address this point of error.[13]

In his motion for rehearing, Cohen seeks to have this court render judgment, as opposed to remanding for a new trial. We have taken into consideration Cohen's arguments, but we disagree that rendering judgment is the appropriate remedy. We deny Cohen's motion for rehearing.

We have reviewed the points raised by appellees in their motion for rehearing, and deny the motion. Appellees strongly urge the application of the holding in the *Tanenbaum* case to the facts of this case, which we refuse to do. As previously stated, it is our view that *Tanenbaum* stands for the proposition that a destruction of collateral without prior notice to the debtor is a disposition of the collateral and is deemed to be a retention in satisfaction of the obligation and therefore no deficiency judgment shall be allowed. *Tanenbaum* expressed a concern that to permit a creditor to destroy collateral without prior notice to the debtor, and assign an arbitrary value as a credit against the debt, could prevent the debtor from obtaining a fair value credit for the collateral. Such concern is not warranted from the facts of the present case. The collateral has not been destroyed and a request was made for the court to order a public sale with the proceeds, if any, to be credited against the debt balance. Likewise, the facts of this case distinguish it from those cases where a creditor has *repossessed* the collateral and either held it for an unreasonable period of time or transferred possession to a third party. Although the Security Agreement and the provisions of section 9.504 would seem to offer Cohen a somewhat less burdensome method of disposing of the collateral, we do not view either of these provisions nor the language in *Tanenbaum* as prohibiting the method of relief sought by Cohen, i.e., judicial foreclosure of his security interest, vesting of title, order for public sale, and credit of proceeds against the debt.

The judgment is reversed and the cause is remanded to the trial court. All costs of this appeal are assessed against appellees.

---

13. However, we note that the potential for creditor abuse which might result if a creditor is permitted to unilaterally dispose of collateral without notifying the debtor, *see Tanenbaum*, 628 S.W.2d at 772, is not present in the case at bar wherein the collateral is and has been available so that appellees have had ample opportunity to evaluate its fair market value. *See also Piney Point Inv. Corp. v. Photo Design, Inc.*, 691 S.W.2d 768, 770 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).