jordan 



 IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-93-199-CV





HENRY G. JORDAN AND CHARLENE HANSON JORDAN,



 APPELLANTS


vs.





COUPLAND STATE BANK, TED W. HEJL, SUBSTITUTE TRUSTEE AND AGENT;


AND C. W. PFLUGER, JR., AS CHAIRMAN OF THE BOARD OF DIRECTORS


OF THE COUPLAND STATE BANK,



 APPELLEES



 






FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT



NO. 89-338-C, HONORABLE WILLIAM S. LOTT, JUDGE PRESIDING



 




 Appellants Henry and Charlene Jordan appeal the denial of their request for a
judgment declaring that a deed of gift and deed of trust, and the subsequent foreclosure under that
deed of trust, were void as an unconstitutional conveyance of the homestead property of Charlene
Jordan's mother. The Jordans also sought damages for usury, breach of contract, violation of a
permanent injunction issued by the U.S. Bankruptcy Court for the Western District of Texas, and
violation of the Texas Business and Commerce Code (1) for failure to dispose of collateral in a
reasonable and timely manner. Coupland State Bank ("the Bank") counterclaimed seeking
declaratory judgment that the lien and foreclosure were valid and seeking attorney's fees. The
trial court rendered judgment for the Bank on all issues, and the Jordans appealed. We will affirm
the trial court's judgment.



HOMESTEAD ISSUES


 This suit involves property located in Williamson County, Texas. The specific
property at issue is approximately 44 acres of land ("the Subject Property") out of a larger 122-acre tract, known as the "Dock Place," near Coupland, Texas. In 1956, Ruth Hanson, Charlene
Jordan's mother, owned the 122 acres; she had inherited 61.45 acres and she and her husband,
John, had purchased the other 60.864 acres. Ruth and John lived in a house that was on the Dock
Place. When John died intestate in 1978, Ruth continued residing in this home. The house was
not located on the Subject Property. 

 The Jordans moved to Austin in 1975 to start a business named Longhorn
Travelers. Due to poor health, Ruth Hanson moved to Austin in 1980 and lived with the Jordans
until 1987. The Jordans added a bedroom to their house for Ruth. However, Ruth left behind
many of her home furnishings and belongings in the house she had lived in on the Dock Place. 
In 1987, Ruth and the Jordans moved back to the Dock Place house and lived there until Ruth's
death in 1988. After Ruth died, the Jordans continued to live on the Dock Place.

 On August 13, 1982, the Jordans executed a promissory note payable to the Bank
for $50,000 ("the 1982 Note"). The security for the 1982 Note was Longhorn Travelers' accounts
receivable and some oil stocks the Jordans owned. In accordance with this agreement, the Jordans
pledged and delivered the oil stock certificates to the Bank. The 1982 Note was renewed and
extended several times. 

 On December 29, 1983, the Jordans executed a note for $57,972.84 payable to the
Bank as a renewal and extension of the previous notes. The note indicated it was secured by a
deed of trust on the Subject Property, a second lien on a tract of land at Apache Shores, various
shares of stock, and a 1974 Mercedes automobile. (2) Charlene testified that C. W. Pfluger, the
Bank's president and chairman of the board, drafted the note to recite a deed of trust lien on the
Subject Property only to satisfy the bank examiners, who were pressuring him to obtain more
collateral on the Jordans' notes.

 On February 27, 1984, Ruth, the Jordans, and Waltraud Hanson, Charlene's sister-in-law, (3) partitioned 58.864 acres (4) out of the Dock Place of which each owned an undivided
interest. Waltraud received 14.716 acres as her sole property, but sold 11.716 acres to the
Jordans on the same day. She also sold her undivided interest in the house to the Jordans. (5) Ruth
and Charlene maintained undivided interests in the Subject Property. 

 On March 3, 1984, four years after she moved to Austin, Ruth conveyed her
interest in the Subject Property to her daughter Charlene by deed of gift. On April 22, 1984, the
Jordans executed a real estate lien note ("the 1984 Note") for $57,972.84 payable to the Bank. 
The 1984 Note was secured by a deed of trust dated April 21, 1984, in favor of the Bank and
covering the Subject Property and the Apache Shores Property. The Jordans defaulted on the
1984 Note, and the Bank eventually foreclosed on the Subject Property on October 2, 1990, two
years after Ruth's death.

 Charlene testified that she executed the deed of trust because Pfluger had begun
pressuring her for it as additional collateral on the outstanding notes. She testified that she told
Pfluger she did not own the Subject Property, to which he stated she "needed to get it into [her]
name." Charlene testified that Pfluger told her the deed of trust would be only for appearance and
that she understood it would never be enforced. Shortly thereafter, Charlene asked Ruth to give
her the Subject Property and Ruth reluctantly agreed because "she knew Mr. Pfluger, and she
knew it was for appearances." 

 Pfluger testified that while he asked the Jordans for more collateral to secure their
debt, he never specified the Subject Property; rather, the Jordans offered it. He further testified
that he never told the Jordans that the Bank would not enforce a deed of trust on the Subject
Property, nor foreclose on the Subject Property if they failed to make payments on the notes. 
Pfluger testified that when the Jordans executed the deed of trust, they never mentioned a
homestead claim; the first time he heard of such a claim was after the Jordans filed suit. Finally,
Pfluger testified that in renewing and extending the Jordans' debt to the Bank, he relied on
representations the Jordans made in the deed of trust that they owned the property and had the
right to convey it. 

 In addition to the Subject Property, Ruth conveyed her interest in the remaining
portions of the 122-acre Dock Place to Charlene through several gift conveyances between 1978
and 1984. In 1980, Ruth also conveyed to Charlene an adjacent 115-acre tract. Charlene
mortgaged her interest in the 115-acre tract in 1984. The Jordans also mortgaged 61.455 acres,
11 acres, and .729 acres of the Dock Place acreage to various lenders in 1984. When asked about
her mother's numerous conveyances to her, Charlene testified that the only one she considered
void was the conveyance of the Subject Property. All of the other gift conveyances were "real"
transactions. Although Ruth conveyed a 61-acre tract by deed of gift on the same day she
conveyed the Subject Property, Charlene maintained that the 61-acre tract conveyance was a
"real" transaction but that the Subject Property conveyance was not.

 Charlene's nephew, David Hanson, testified that Charlene leased the Subject
Property to him between 1983 and 1989 and collected rent. David (6) testified that around 1984 or
1985, Charlene represented to him that rent money generated from leases of the 122 acres
belonged to her because she owned the property. David testified that he planted crops and grazed
cattle on the 122 acres during his lease; this was the only use of the property during that time. 
Waltraud, David's mother, testified that "about" 1983 or 1984 Charlene told her that she owned
the 122 acres. Charlene denied these statements and testified that David and Waltraud were
mistaken or lying. She also denied leasing the Subject Property to David.

 On September 17, 1986, the Jordans filed a chapter 11 bankruptcy. The Jordans
stated in their bankruptcy schedules, under penalty of perjury, that they owned the Subject
Property, which was subject to the lien of the Bank. Charlene testified that she listed the Subject
Property because of her "future" interest in that property. (7) Schedule A-2 required the Jordans to
designate if they disputed the Bank's secured claim; the Jordans did not designate that they
disputed the claim, although they did designate other claims as disputed. The Bank filed a motion
for relief from automatic stay, requesting that the bankruptcy court lift the automatic stay to allow
the Bank to foreclose on the Subject Property. On June 9, 1987, the Jordans stipulated in an
agreed order issued on a motion to lift the stay that the Bank held a valid security interest in the
Subject Property. 

 In their pleadings, the Jordans originally claimed that Charlene had a homestead
right in the property which had been violated, but they later asserted they were claiming Ruth's
homestead rights. The Jordans filed their first amended original petition and application for
declaratory judgment on January 23, 1991. The Jordans alleged that (1) the deed of gift from
Ruth to Charlene conveying the Subject Property was void as a violation of the homestead laws;
(2) the new note and deed of trust the Jordans executed after their discharge in bankruptcy were
void for lack of consideration; (3) the Bank had breached an agreement not to foreclose on the
Subject Property; (4) the Bank, in counterclaiming against the Jordans for the deficiency due on
the most recent note, had violated the bankruptcy court's permanent injunction enjoining the
Jordans' creditors from seeking to collect a discharged debt; and (5) the Bank had improperly
retained the Jordans' stock certificates.

 At trial below, the Jordans argued that the Subject Property was Ruth's homestead,
and that Ruth's conveyance of the property to Charlene was void because it was done solely to
bypass the homestead laws. In other words, Ruth only conveyed the property to allow the Bank
to obtain a property lien that otherwise would have violated the homestead laws. They argued that
all parties involved did not really intend the instrument to be enforceable or have any real
meaning, that it was merely a "pretend" conveyance.

 The trial court concluded that the Jordans' claims must fail for several reasons. 
First, the court concluded that Ruth abandoned any homestead claim she had on the Subject
Property when she moved to Austin, and that the Subject Property was not Ruth's homestead
when she conveyed the property to the Jordans. Alternatively, the court concluded that Ruth
abandoned the homestead when she gave the property to Charlene. Second, the court concluded
that the Jordans were estopped by res judicata and collateral estoppel principles because of the
agreed order rendered in bankruptcy court. The court concluded that the Jordans also were
estopped from denying the validity of the Bank's lien because the Bank reasonably relied on their
representations in making the lien and did not have notice that the deed of gift was a pretend
conveyance. Finally, the court concluded that the Bank's lien was valid at least to Charlene's
undivided interest in the property.

 In points of error nine through twenty and point twenty-six, the Jordans attack these
conclusions as well as the legal and factual sufficiency of the evidence to support the trial court's
underlying findings of fact. The Jordans also challenge the trial court's alleged failure to find
several facts in their favor.

 We attach to a trial court's findings of fact the same weight that we attach to a
jury's verdict upon jury questions. Nelson v. Jordan, 663 S.W.2d 82, 86 (Tex. App.--Austin
1983, writ ref'd n.r.e.). Findings of fact are reviewable for legal and factual sufficiency of the
evidence by the same standards used to review jury findings. Okon v. Levy, 612 S.W.2d 938, 941
(Tex. App.--Dallas 1981, writ ref'd n.r.e.).

 In deciding a legal sufficiency point, we must consider only the evidence and
inferences tending to support the finding of the trier of fact and disregard all evidence and
inferences to the contrary. Alm v. Aluminum Co. of Am., 717 S.W.2d 588, 593 (Tex. 1986),
cert. denied, 498 U.S. 847 (1990); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). When
considering factual sufficiency questions, we are required to review all the evidence in the record,
including any evidence contrary to the finding of the court, and decide whether the judgment is
so against the great weight and preponderance of the evidence as to be manifestly unjust. Beltran
v. Groos Bank, N.A., 755 S.W.2d 944, 945 (Tex. App.--San Antonio 1988, no writ) (citing In re
King's Estate, 244 S.W.2d 660 (Tex. 1951)).

 A trial court's conclusions of law are always reviewable. Middleton v. Kawasaki
Steel Corp., 687 S.W.2d 42, 44 (Tex. App.--Houston [14th Dist.] 1985, writ ref'd n.r.e.). 
Erroneous conclusions of law are not binding on an appellate court. LaChance v. Hollenbeck, 695
S.W.2d 618, 622 (Tex. App.--Austin 1985, writ ref'd n.r.e.). On appeal, the trial court's
judgment will be upheld if it can be sustained on any legal theory supported by the evidence. 
Simpson v. Simpson, 727 S.W.2d 662, 664 (Tex. App.--Dallas 1987, no writ).

 The Jordans argue, essentially, that there is insufficient evidence to support the trial
court's findings supporting its conclusion that Ruth abandoned her homestead interest in the
Subject Property when she moved to Austin or, alternatively, when she conveyed the Subject
Property to Charlene by deed of gift. Similarly, the Jordans attack the findings or conclusions
that Ruth intended the conveyance of the Subject Property to be a valid one, as opposed to a
pretend conveyance for the sole purpose of bypassing the homestead laws. 

 Even assuming Charlene has standing to assert her deceased mother's alleged
homestead rights, (8) we conclude there was both legally and factually sufficient evidence to support
the trial court's failure to find that the deed of gift and 1984 deed of trust were invalid. The
Jordans' key evidence regarding whether Ruth actually intended to convey the Subject Property
to Charlene was Charlene's testimony. Charlene testified that her mother did not intend to do so. 
The Jordans also called witnesses to testify that Ruth left behind many of her personal belongings
in the house on Dock Place; that while staying with the Jordans in Austin, Ruth expressed a desire
to go back to the house on Dock Place; and that Ruth moved back to that house for a short time
before her death. The Jordans further presented evidence that the deed of gift conveying the
Subject Property to Charlene was not formally recorded until approximately two months after the
deed of trust securing the 1984 Note, and that after the deed of gift was executed (but before it
was recorded) Ruth and Waltraud granted Charlene a roadway easement over the Subject
Property. The Jordans contend this evidence proves Ruth did not intend to convey the Subject
Property to Charlene or to abandon her homestead interest. Even if such evidence supports their
contentions, it is not conclusive proof that Ruth did not intend to abandon her homestead or
validly convey the Subject Property to Charlene. 

 Furthermore, there was a substantial amount of evidence that Ruth did intend to
convey the Subject Property to Charlene, and to abandon her homestead interest in the property. 
The Jordans added a room to their house just for Ruth. Ruth conveyed all of her interest in the
remaining portions of Dock Place to Charlene, as well as her interests in an adjacent 115-acre
tract. Charlene testified that Ruth intended all such conveyances to be valid except for the one
concerning the Subject Property. Charlene leased the Subject Property to David Hanson and
collected the rent in her own name, telling her relatives the land belonged to her. (9) Pfluger
testified that the Jordans offered the Subject Property as collateral for the 1984 Note, and that he
never informed them that the lien was invalid or that the Bank would not foreclose on the Subject
Property if they defaulted on the note. Pfluger further testified that the Jordans never mentioned
a potential homestead claim on the Subject Property until they filed suit, and that he had relied
on the Jordans' representations that they owned the Subject Property in renewing and extending
their debt. Finally, in their bankruptcy schedule A-2, under penalty of perjury, the Jordans listed
the Bank as having a deed of trust lien on the Subject Property, but did not indicate that the claim
was disputed. However, on the same document, the Jordans did indicate that other creditors'
claims were disputed. 

 In light of the evidence, we hold that the evidence is legally and factually sufficient
to support the trial court's challenged findings. In addition, we hold that appellants' legal and
factual sufficient complaints concerning the trial court's failure to find the facts asserted by
appellants must fail. It is well established that "determining the credibility of the evidence and
the weight to be given thereto is within the sole province of the trier of fact, who had the
opportunity to observe the witnesses' demeanor on the stand, and . . . if sufficient evidence exists
to support the trial court's findings, they will not be disregarded." Nelson, 663 S.W.2d at 86
(citing In re Kings Estate, 244 S.W.2d 660 (Tex. 1951)); see also Johnson v. Buck, 540 S.W.2d
393, 411 (Tex. Civ. App.--Corpus Christi 1976, writ ref'd n.r.e.). 

 We further hold that, based on these findings, the court's conclusions were proper. 
If Ruth intended to convey her interest in the Subject Property to Charlene, and to abandon her
homestead interest in that property, then the Jordans' claims must fail. 

 Finally, the Jordans do not address the issue of Charlene's undivided one-fourth
interest in the Subject Property. (10) When Charlene's father died intestate, Charlene inherited an
undivided one-fourth interest in the Subject Property. (11) She owned at least this interest in the
Subject Property even before the partition or Ruth's conveyance of the rest of it to her by deed
of gift. The Jordans fail to address why they could not have executed a valid lien on the Subject
Property by virtue of this one-fourth interest. For the foregoing reasons, points of error nine
through twenty and point twenty-six are overruled.


 

USURY


 In points of error one through eight, the Jordans challenge the trial court's findings
and conclusions regarding their allegations that the Bank charged a usurious interest rate on the
1984 Note. 

 In point of error two, the Jordans complain of the trial court's admission into
evidence of certain exhibits containing a list of real estate lien notes of other customers of the
Bank and the interest rates the Bank charged on such notes. The Jordans cite no authority to
support their contention that such evidence was inadmissible, and therefore have waived this
complaint for review. See Tex. R. App. P. 74(f); see also Toungate v. Bastrop Indep. Sch. Dist.,
842 S.W.2d 823, 828 (Tex. App.--Austin 1992, no writ); Rayburn v. Giles, 182 S.W.2d 7 (Tex.
Civ. App.--San Antonio 1944, writ ref'd). 

 In point of error four, the Jordans argue there were no findings to support the trial
court's conclusion that their usury claim was barred by the statute of limitations. We disagree.

 The parties agree that the statute of limitations for a usury claim is four years and
that it is triggered when the usurious interest is actually "received or collected," in other words,
when it is paid. Tex. Rev. Civ. Stat. Ann. art. 5069-1.06(3) (West 1987); Aguilar v. Anderson,
855 S.W.2d 799, 803 (Tex. App.--El Paso 1993, writ denied); Cook v. Frazier, 765 S.W.2d 546,
553 (Tex. App.--Fort Worth 1989, no writ).

 On August 2, 1991, the Jordans supplemented their first amended original petition
to allege that the Bank had charged them usurious interest on the 1984 Note. The Jordans'
complaint arises from the following language in the 1984 Note:



For value received, CHARLENE G. JORDAN and husband HENRY G.
JORDAN, as principals, promise to pay to the order of COUPLAND STATE
BANK . . . ($57,972.84) . . . bearing interest at the rate of two (2) points over
Coupland State Bank's prime rate, the initial rate of interest for the first twelve
(12) months being 14% from the 22nd day of April, 1984, the interest payable
together with the principal on an annual basis on the 22nd day of April, 1985. The
principal of said note being due and payable in five (5) annual installments of
$_____ each due on or before the 22nd day of April of each succeeding April
thereafter until the whole principal sum is paid. The bank is under no obligation
to re-finance the loan at the end of one year or in any succeeding year and the rate
of interest will be recalculated on an annual basis.



(Emphasis added.) Charlene drafted the 1984 Note at the Bank's request. Because Charlene
copied the 1984 Note from a note of another bank, certain language was inapplicable to the Bank. 
Specifically, the Bank did not have a published prime rate at the time the 1984 Note was executed. 
Nevertheless, the parties used the 1984 Note as drafted, inserting "14%" as the interest rate
calculated for the first year. After the first year, the Bank simply left the interest rate at fourteen
percent, charging fourteen percent for the duration of the 1984 Note. During this time, the
Jordans neither objected to the interest charged nor requested a recalculation of the interest. Now,
however, the Jordans claim that charging fourteen percent after the first year was usurious because
the provision referring to the Bank's prime rate was ambiguous, and because it applied only to
interest calculations after the first year. Because the provision was ambiguous, they contend the
Bank was limited to charging six percent interest after the first year. See Tex. Rev. Civ. Stat.
Ann. art. 5069-1.03 (West 1987). Therefore, the Jordans claim the Bank charged usurious
interest in a May 20, 1987, letter from the Bank's attorneys to the Jordans' attorneys stating the
total interest charge through September 17, 1986, calculated at 14% per annum. (12) 

 The Jordans made their first and only interest payment on April 20, 1985. (13) 
However, the Jordans contend that they also paid usurious interest when the Bank foreclosed on
the Subject Property and credited the note with the proceeds from the sale. They contend it is this
final "payment" of interest that triggered the statute of limitations, and thus their claim is not
barred because they filed suit within four years after this payment. 

 The crux of the Jordans' argument is that the "ambiguous" language applied only
to interest calculations after the first year. They do not explain this interpretation of the 1984
Note, and we do not adopt it here. The Jordans attempt to argue that the same language that
makes the instrument usurious also makes it legal for their purposes. In other words, they
disregard the language, "bearing interest at the rate of two (2) points over Coupland State Bank's
prime rate," for purposes of calculating the first year's interest rate, but then apply that same
language to the rest of the note in order to argue that the Bank charged usurious interest after the
first year. We cannot agree with this interpretation. If the language applies at all, it applies to
the interest calculation for the entire note. Accordingly, the Jordans' first interest payment would
have triggered the statute of limitations, and their usury claim is barred. 

 If, on the other hand, it is proper to delete the ambiguous language in order to
construe the instrument, then it should be deleted entirely, and the rest of the provisions given
effect. See Holmes v. Dallas Int'l Bank, 718 S.W.2d 59, 61 (Tex. App.--Dallas 1986, writ ref'd
n.r.e.) (deleting language from instrument that did not specify which bank's prime rate controlled,
but giving effect to remaining provisions regarding interest). Read in this manner, the only
reference in the 1984 Note concerning interest would call for the rate of fourteen percent for the
first year with recalculation of interest each year thereafter. This construction would eliminate
any ambiguity in the 1984 Note, and the interest charged would not have exceeded the legal
amount of eighteen percent.

 We further conclude there was sufficient evidence to support the trial court's
finding that the parties agreed to the fourteen percent interest rate charged after the first year, thus
taking the agreement out from under the six percent legal maximum rate. The record reflects that
the parties had extensive business dealings with one another. Charlene, herself, drafted the 1984
Note, including the language that "the rate of interest will be recalculated on an annual basis."
(Emphasis added.) Charlene testified that she and Pfluger agreed that the interest rate for the first
year would be fourteen percent and that thereafter it would be variable. She agreed that she knew
the interest rate was to be adjusted annually. There was evidence that the Jordans knew they were
being charged fourteen percent interest on the 1984 Note since at least May 20, 1987, when the
Bank's attorneys sent a letter to the Jordans' attorneys. However, the Jordans never disputed the
figure or asked the Bank to recalculate their interest rate. On the contrary, the Jordans stipulated
for purposes of an agreed order to the amount of interest owing on the 1984 Note, calculated at
fourteen percent per annum. After their discharge in bankruptcy, the Jordans then executed new
notes that also calculated interest at fourteen percent per annum. 

 Pfluger testified that he never intended to use the ambiguous language as a
subterfuge or contrivance to avoid the usury laws, and that the "going" rate of interest that the
Bank charged during the relevant years was fourteen percent. He testified that he simply left the
rate at fourteen percent after the first year because the Jordans did not request a recalculation. 

 "The question of whether an agreement was reached by the parties is generally
a question of fact where the existence of the agreement is disputed." Preston Farm & Ranch
Supply v. Bio-Zyme Enters., 625 S.W.2d 295, 298 (Tex. 1981). Furthermore, an agreement
between parties as to the amount of interest to be charged need not be in writing and may be
established by course of conduct. Id.; see also Matter of Worldwide Trucks, Inc., 948 F.2d 976,
980 (5th Cir. 1991). The question of usury must be determined by examining and construing all
the documents constituting the transaction, and interpreting them as a whole in light of the
surrounding circumstances. Tygrett v. University Gardens Home Ass'n, 687 S.W.2d 481, 485
(Tex. App.--Dallas 1985, writ ref'd n.r.e.). Finally, we note the "presumption that the parties
intended a nonusurious contract; when the contract by its terms, construed as a whole, is doubtful,
or even susceptible to more than one reasonable construction, the court will adopt the construction
which comports with legality." Id. Thus, "[i]f there is any doubt as to the intent of the parties
to the transaction alleged to be usurious, a presumption of nonusurious intent will lead a court to
resolve such doubt in favor of a finding of legality." Matter of Worldwide Trucks, Inc., 948 F.2d
at 979.

 We conclude there was sufficient evidence to support the trial court's finding that
the parties agreed to the fourteen percent interest rate even after the first year of the 1984 Note. 
From the parties' course of conduct, the court could conclude that the Jordans agreed to a fourteen
percent interest rate for the duration of the 1984 Note. See Matter of Worldwide Trucks, Inc., 948
F.2d at 981 n. 7; see also Preston Farm & Ranch Supply, 625 S.W.2d at 298. For the foregoing
reasons, points of error one through eight are overruled.



ATTORNEY'S FEES


 In points of error twenty-one and twenty-two, the Jordans complain the trial court
erred in failing to award them $2,156.50 as actual damages incurred as attorney's fees required
to defend against the Bank's counterclaim for the deficiency owing on a note after the Jordans'
discharge in bankruptcy.

 On April 18, 1988, the bankruptcy court discharged the Jordans' debts. On May
31, 1988, the Jordans executed a new note payable to the Bank ("the 1988 Note") for $60,000 due
June 1, 1989. The 1988 Note was secured by a deed of trust on the Subject Property. The 1988
Note was a renewal of a note executed by the parties pursuant to the agreed order that the
bankruptcy court approved on June 9, 1987. (14) 

 On August 7, 1990, the Bank filed its amended original answer and cross-claim. 
The Bank sought the unpaid balance due under the 1988 Note and foreclosure of the lien, as well
as attorney's fees.

 The Jordans then filed a motion to reopen the case before the bankruptcy court,
seeking a determination that the Bank was permanently enjoined from pursuing its counterclaim
against the Jordans because the debt had previously been discharged. During the hearing, the
court asked counsel for the Bank if it was seeking to enforce the Jordans' personal liability on the
1988 Note. Counsel responded that the Bank was solely interested in foreclosing its lien on the
Subject Property, and that it waived any of its claims for personal liability in its pleadings. The
court stated that it would reopen the case solely to determine dischargeability as to the Jordans'
personal liability, but that it would not reopen for a determination of the validity of the Bank's
lien. The court then instructed counsel that if the Bank filed a motion to dismiss with prejudice
the portion of its complaint seeking a deficiency judgment against the Jordans within ten days, the
court would not reopen the case. Counsel for the Bank agreed to do so, and filed the motion to
dismiss the entire counterclaim on November 6, 1990. 

 The bankruptcy court did not reopen the case. Furthermore, the bankruptcy court
did not make any rulings during or after the hearing that the Bank had violated the permanent
injunction or that its counterclaim was wrongful. The court simply stated its intention to reopen
the case for a determination of whether the debt was discharged if the Bank pursued its claim for
personal liability against the Jordans. 

 We first note that the Jordans present no authority or argument in support of their
contention that they should be awarded actual damages in this context and therefore have waived
this complaint for our review. See Tex. R. App. P. 74(f); Toungate, 842 S.W.2d at 828;
Rayburn, 182 S.W.2d 7. Furthermore, the Jordans do not seek the requested amount as
attorney's fees in conjunction with their declaratory-judgment action; rather, they pleaded in the
court below and argue on appeal that they are entitled to attorney's fees as actual damages. It is
well settled that "attorney's fees incurred in prosecuting a suit for or defending against a wrong
are not ordinarily recoverable as actual damages." Houghton v. Wholesale Elec. Supply, 435
S.W.2d 216, 220 (Tex. Civ. App.--Waco 1968, writ ref'd n.r.e.) (citing Wm. Cameron & Co.,
Inc. v. American Surety Co., 55 S.W.2d 1032, 1035 (Tex. Comm'n App. 1932, holding approved
in part)) (emphasis added). Furthermore, "[u]nless provided by statute or by contract of the
parties, attorneys' fees incurred by a party to litigation are not recoverable against his adversary
either in an action in tort or a suit upon a contract." Id.; see also Mays v. Witt, 387 S.W.2d 688,
690-91 (Tex. Civ. App.--Amarillo 1965, no writ). The Jordans fail to assert any statute or
contract which would entitle them to attorney's fees as damages in this context. We overrule
points of error twenty-one and twenty-two. 

 In point of error twenty-three, the Jordans contend that since the Bank dismissed
with prejudice its counterclaim for a deficiency judgment, in which the Bank sought attorney's
fees, the Bank should not have been allowed to reassert its right to attorney's fees in its
counterclaim for declaratory judgment. 

 Again, the Jordans fail to present any argument or authority for this contention, and
therefore have waived it for our review. See Tex. R. App. P. 74(f). Second, not only was the
Bank asserting two different claims in asking for attorney's fees, it was also seeking attorney's
fees under two entirely different theories. In the first counterclaim, the Bank sought attorney's
fees pursuant to a provision in the 1988 Note. In the declaratory judgment counterclaim, the Bank
sought attorney's fees pursuant to the Uniform Declaratory Judgments Act. See Tex. Civ. Prac.
& Rem. Code Ann. § 37.009 (West 1986). The Jordans have failed to demonstrate why the Bank
was not entitled to reassert its claim for attorney's fees in this situation. Point of error twenty-three is overruled. 

 In point of error twenty-seven, the Jordans state, "Appellants conclusively proved
that $27,000.00 was a reasonable attorney's fee for prosecution of Appellants' claims, and
accordingly the trial court erred in not entering judgment in favor of Appellants for such fees." 

 The Jordans assert that they stipulated with the Bank on the record that $27,000
would be "a reasonable fee for prosecution of Appellants' claims." (Emphasis added.) The
Jordans' counsel stated on the record:



The stipulation is that for both the Plaintiffs and the Defendants in this case, that
a reasonable attorney's fee for the trial of this case is $27,000. We are not
stipulating that either side is entitled to recovery of attorney's fees, but merely that
that is a reasonable fee. . . . To clarify that, if it's possible, what we've agreed
to is that if the Plaintiffs win the cause of action based on the homestead issue and
any other issues, or only that issue, the reasonable fee will be $27,000. If the
Plaintiffs are unsuccessful in their homestead claim but are successful on one or
more of the other claims, a reasonable fee would be only $5000. . . . And again,
we're only stipulating to the reasonableness of the fees, not that either side is
entitled to it.



(Emphasis added.) We conclude that the parties' stipulation regarding attorney's fees was for the
sole purpose of determining the reasonableness of such fees, and not one side's entitlement to such
fees.

 The Jordans further assert that article 5069-1.06 of the Texas Revised Civil Statutes
entitles them to attorney's fees, even if they lose on the merits of their usury claim. See Tex.
Rev. Civ. Stat. Ann. art. 5069-1.06(3) (West 1987). We find this contention completely without
merit. Id. Point of error twenty-seven is overruled.



RETENTION OF COLLATERAL
 

 In points of error twenty-four and twenty-five, the Jordans complain, essentially,
that the Bank accepted their pledged oil stock certificates in full satisfaction of the Jordans' debt
under section 9.505 of the Texas Business and Commerce Code. See Tex. Bus. & Com. Code
Ann. § 9.505 (West 1991). The trial court made several findings of fact which the Jordans do not
challenge, and upon which we rely here. 

 The Jordans pledged 150 shares of BobCat Oil, 1700 shares of Altex Oil Co., and
30 shares of K.R.M Petroleum ("the Collateral") to the Bank under a Security Agreement dated
June 21, 1975, to secure their debts to the Bank. The Security Agreement allowed the Bank to
secure all of the Jordans' debt to the Bank on the Collateral. Upon executing the Security
Agreement, the Jordans voluntarily delivered the Collateral to the Bank. The Collateral has very
little monetary value. 

 The Jordans never requested that the Bank retain the Collateral in full satisfaction
of their debts; furthermore, before litigation, the Jordans never requested that the Bank sell the
Collateral or return it to them. The Bank never sent written notice to the Jordans that it intended
to retain the Collateral in full satisfaction of the their debt. The Bank did not foreclose upon the
collateral, nor did it dispose of the Collateral in any manner. However, at the time of trial, the
Bank still maintained possession of the Collateral. The trial court concluded that, because the
Bank had not pursued foreclosure against the Collateral, it should return the Collateral to the
Jordans. 

 The Jordans contend, essentially, that because the Bank did not give them notice
under either section 9.504 or section 9.505 of the Business and Commerce Code (15) after the
Jordans' default, the Bank is deemed to have retained the collateral in full satisfaction of the debt,
citing Tanenbaum v. Economics Laboratory, Inc., 628 S.W.2d 769 (Tex. 1982). We disagree. 


 In Tanenbaum, the supreme court held that a creditor cannot sue for a deficiency
after he elects to retain collateral under section 9.505. Tanenbaum, 628 S.W.2d at 771; see also
Cohen v. Rains, 769 S.W.2d 380, 385 (Tex. App.--Fort Worth 1989, writ denied). The issue in
Tanenbaum was whether a creditor's disposition of collateral by destruction, without notice to the
debtor, barred a suit for the deficiency. Tanenbaum, 628 S.W.2d at 770; see also Cohen, 769
S.W.2d at 387. The creditor had taken possession of the collateral and, deciding it was not
economically feasible to repair it, scrapped it; he then sued for the balance due on the debt minus
the scrap value of the collateral. Tanenbaum, 628 S.W.2d at 770. The supreme court held that
by destroying the collateral without notice to the debtor, the creditor was deemed to have retained
the collateral in full satisfaction of the debt under section 9.505. Id. at 772; see also Cohen, 769
S.W.2d at 387; Piney Point Inv. Corp. v. Photo Design, Inc., 691 S.W.2d 768, 770 (Tex.
App.--Houston [1st Dist.] 1985, writ ref'd n.r.e.). Because section 9.505 does not provide for a
deficiency judgment, the creditor was then barred from suing for the deficiency. Tanenbaum, 628
S.W.2d at 772; see also Cohen, 769 S.W.2d at 387. 

 Tanenbaum is distinguishable from the instant cause. Here, the issue is whether
the Bank can be deemed to have retained the Collateral under section 9.505, although it has done
nothing to indicate its intent to retain the Collateral in full satisfaction of the debt. A creditor's
mere possession of collateral, alone, does not constitute an election to retain the collateral in full
satisfaction of the debt. Piney Point Inv. Corp., 691 S.W.2d at 770; but see Texas Nat. Bank v.
Karnes, 711 S.W.2d 389, 391-92 (Tex. App.--Beaumont 1986), aff'd in part, rev'd in part on
other grounds, 717 S.W.2d 901 (Tex. 1986) (concluding that bank's repossessing van and
maintaining possession for over five years defeated bank's right to offset). Accordingly, we must
decide whether the Bank "manifested an intention" to retain the Collateral in complete satisfaction
of the Jordans' debt. See Cohen, 769 S.W.2d at 388. The Jordans have not presented evidence
of such an intent. Accordingly, we conclude the trial court's failure to find such an intent on the
part of the Bank was not against the great weight and preponderance of the evidence. The trial
court correctly concluded that the Bank was entitled to sue for the deficiency, and properly
ordered the Bank to return the Collateral to the Jordans. Points of error number twenty-four and
twenty-five are overruled. 

 Having overruled all points of error, we affirm the trial court's judgment.



 

 Marilyn Aboussie, Justice

Before Justices Powers, Aboussie and Jones

Affirmed

Filed: September 28, 1994

Do Not Publish

1.   Tex. Bus. & Com. Code Ann. §§ 9.504-.505 (West 1991). 
2.   Charlene testified that she gave the Bank title to her Mercedes and that the stock
certificates were the same ones referenced in the earlier notes. 
3.   Waltraud had been married to Charlene's deceased brother, Dale. Waltraud was
the sole beneficiary under Dale's Will, and thus inherited the undivided portion of the
60.864-acre tract that Dale had received when his father died intestate.
4.   Originally this was the 60.864 acres Ruth and her husband had purchased while
married. However, at one point they had conveyed one acre to Charlene, and one acre to
Dale.
5.   The house was located on Waltraud's property, but the partition agreement states
that Waltraud's portion is exclusive of "house, barns, other buildings and improvements
which will be held in common and divided at a later date, . . ."
6.   David testified through videotaped oral deposition. His testimony was admitted at
trial as a transcribed deposition.
7.   Regardless of any future interest Charlene might receive in the Subject Property,
however, she owned at least an undivided 1/4th interest in the Subject Property through
inheritance from her father, who died intestate.
8.   We note that a void instrument may be attacked by a person who was not a party to
it, as long as that person's rights were affected by the transaction. McGahey v. Ford, 563
S.W.2d 857, 861 (Tex. Civ. App.--Fort Worth 1978, writ ref'd n.r.e.). However, the Jordans
are not asserting their own rights, but rather Ruth's rights. Furthermore, they are not
asserting Ruth's rights on her behalf, for she is deceased, and they do not invoke the
protection of Ruth's homestead rights as innocent third parties. Instead, they attempt to undo
a fraudulent transaction in which they participated and from which they benefitted, so that they
can now be protected from the transaction's consequences. However, the Texas Supreme
Court has noted that a person may be estopped from claiming a homestead exemption "when
the owners create a lien by entering into a simulated transaction which has all the outward
appearance of a valid, unconditional sale, but which is in fact a mortgage . . . ." Lincoln v.
Bennett, 156 S.W.2d 504, 505 (Tex. 1941). 
9.   Although Charlene attacks the sufficiency of the evidence to support the court's
finding that she leased the Subject Property to David Hanson, this challenge must fail. 
Despite any conflicting evidence on this issue, there was evidence in the record to support
the court's finding. In this situation, the court's finding must stand. Nelson, 663 S.W.2d
at 86.
10. The Jordans simply contend, "Appellee did not plead that the 1984 Deed of Trust
conveyed a valid lien on Charlene Jordan's undivided future interest in the Subject
Property, and therefore the trial court's conclusion to that affect was erroneous." We
conclude that the Jordans' own pleadings placed this issue squarely before the court by
asserting the Bank's lien as completely void.
11. Act of Apr. 4, 1955, 54th Leg., R.S., ch. 55, § 45, 1955 Tex. Gen. Laws 88, 103
(Tex. Prob. Code Ann. § 45, since amended).
12. The letter asks the Jordans' attorney to stipulate to these facts for purposes of
submission of the Bank's motion to lift stay.
13. The Jordans assert that this payment was made on April 23, 1985, in conflict with
certain testimony and evidence indicating it was made on April 20, 1985. Nevertheless,
the exact date is irrelevant for our purposes. 
14. The agreed order called for a denial of the Bank's motion to lift stay in order to
foreclose on the Subject Property, subject to a requirement that the Jordans execute a
real estate lien note to the Bank requiring them to pay interest on their outstanding debt
to the Bank for one year. If the Jordans failed to make any of the interest payments, the
Bank became entitled to exercise all of its rights under state law and the deed of trust
securing the Subject Property; furthermore, the stay was to terminate automatically on
May 31, 1988, at which time the Bank could exercise its rights under state law and the
deed of trust. Pursuant to the agreed order, the Jordans executed a new note to the Bank
for $60,062.60. The note, which was dated August 31, 1987, but apparently effective
June 1, 1987, was not executed until May 17, 1988. It was secured by the deed of trust
on the Subject Property. The note was then renewed on May 31, 1988, as the 1988 Note.
15. Section 9.504 states in relevant part:


(a) A secured party after default may sell, lease or otherwise dispose of any
or all of the collateral in its then condition or following any commercially
reasonable preparation or processing. . . .


(b) If the security interest secures an indebtedness, the secured party must
account to the debtor for any surplus, and, unless otherwise agreed, the
debtor is liable for any deficiency. . . .


(c) Disposition of the collateral may be by public or private proceedings . . . . 
[E]very aspect of the disposition including the method, manner, time, place
and terms must be commercially reasonable. Unless collateral is perishable
or threatens to decline speedily in value or is of a type customarily sold on a
recognized market, reasonable notification of the time and place of any public
sale or reasonable notification of the time after which any private sale or
other intended disposition is to be made shall be sent by the secured party to
the debtor, if he has not signed after default a statement renouncing or
modifying his right to notification of sale . . . .


Tex. Bus. & Com. Code Ann. § 9.504 (West 1991) (emphasis added).


Section 9.505 states in relevant part:


(b) In any other case involving consumer goods or any collateral a secured party
in possession may, after default, propose to retain the collateral in
satisfaction of the obligation. Written notice of such proposal shall be sent to
the debtor if he has not signed after default a statement renouncing or
modifying his rights under this subsection. In the case of consumer goods no
other notice need be given. In other cases notice shall be given to any other
secured party who has a security interest in the same collateral . . . . If the
secured party receives objection in writing from a person entitled to receive
notification within twenty-one days after the notice was sent, the secured
party must dispose of the collateral under Section 9.504. In the absence of
such written objection the secured party may retain the collateral in
satisfaction of the debtor's obligation.


Tex. Bus. & Com. Code Ann. § 9.505 (West 1991) (emphasis added).