Opinion filed June 16, 2011



In The

# Eleventh Court of Appeals

_____

## No. 11-09-00196-CV
_____

### C. KYLE SMITH, Appellant
### V.
### COMMUNITY NATIONAL BANK, Appellee

**On Appeal from the 238th District Court**
**Midland County, Texas**
**Trial Court Cause No. CV-46,394**

### O P I N I O N

Trans-Gulf Drilling Services, Inc. and Trans-Gulf Rig #1, LP (collectively Trans-Gulf) executed a note and security agreement dated October 29, 2007, in favor of Community National Bank (CNB). The promissory note was in the original principal amount of $2,336,182 and was secured by a drilling rig, related equipment, and an insurance policy on the rig. C. Kyle Smith, the director of Trans-Gulf, issued a personal guaranty to CNB in which he guaranteed the amount due to CNB under the note.

Trans-Gulf filed for Chapter 11 bankruptcy in January 2008. On February 28, 2008, CNB sought relief from the bankruptcy court to foreclose its security interest in the rig and equipment. In March, CNB also brought this action against Smith as guarantor of the note. On October 28, 2008, the rig collapsed and became incapable of operating. Trans-Gulf's insurance company was notified of the collapse, and a claim was submitted for the value of the rig.

The bankruptcy trustee entered into a stipulation with CNB to assign to CNB all of the rights of the trustee, Trans-Gulf, and the bankruptcy estate in the rig, the equipment, and the related insurance claim. On March 1, 2009, the bankruptcy court entered an agreed order approving the stipulation and assigning and transferring the rig, equipment, and insurance claim from Trans-Gulf's estate to CNB.

CNB filed a traditional motion for summary judgment against Smith. On June 5, 2009, the trial court granted summary judgment to CNB and rendered judgment against Smith in the amount of $2,828,612.26. In Smith's appeal, he presents three issues to this court:

> (1) Whether the assignment of the rig, equipment, and insurance claim to CNB was an acceptance by CNB of the collateral in full or partial satisfaction of Trans-Gulf's indebtedness;

> (2) Whether the assignment of the rig, equipment, and insurance claim to CNB constituted value which should be credited against the amount guaranteed by Smith; and

> (3) Whether CNB's entry into the stipulation constituted an accord and satisfaction of Trans-Gulf's and Smith's indebtedness.

CNB agrees that it should provide Smith a credit for the insurance proceeds it received and the amount it received from the sale of the equipment, less its expenses. In its brief, CNB states that it received $1.9 million in insurance proceeds on August 5, 2009, and $102,400 from the sale of the equipment. CNB claims that, after deducting expenses incurred in connection with the insurance settlement and sale of the equipment, it offered Smith a credit against the judgment of $1,810,872. These amounts are not part of the record for the summary judgment and cannot be considered as part of this appeal. However, Smith is due a credit if CNB sold the rig and equipment and received insurance proceeds.

We affirm the trial court's judgment except for the amount of damages. We sustain the second issue in part, disagreeing with Smith's contention that the value of the credit should be determined at the time of the agreed order. The amounts of the proceeds from the insurance settlement and from the sale, as well as the expenses incurred by CNB, should be easily determined. We remand to the trial court for a determination of the amount of the credit that Smith is due for the insurance proceeds and sale proceeds received by CNB after deducting its expenses incurred in connection with the insurance settlement and the sale of the equipment.

2

*Standard of Review*

A trial court should grant a motion for summary judgment if the moving party establishes that (1) no genuine issue of material fact exists and (2) the moving party is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991). Once the movant establishes his right to a summary judgment, the nonmovant must come forward with evidence or law that precludes summary judgment. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678-79 (Tex. 1979). In a case where the defendant has alleged an affirmative defense and the plaintiff has filed a motion for summary judgment establishing that there is no material fact issue concerning the elements of the plaintiff's claim, the motion should be granted unless the defendant comes forward with summary judgment proof sufficient to raise an issue of fact with respect to the elements of the affirmative defense. *Nichols v. Smith*, 507 S.W.2d 518, 520 (Tex. 1974); *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934 (Tex. 1972). When reviewing a summary judgment, we take as true evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in favor of the nonmovant. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985).

*Law of Guaranty*

To recover for breach of the guaranty agreement, CNB had to establish (1) the existence and ownership of the guaranty agreement, (2) the terms of the underlying contract by the holder, (3) the occurrence of the conditions upon which liability is based, and (4) the failure or refusal to perform the promise by the guarantor. *Escalante v. Luckie*, 77 S.W.3d 410, 416 (Tex. App.—Eastland 2002, pet. denied). The record reflects that CNB produced evidence establishing each of the four requirements.

A secured party is not required to dispose of the collateral through foreclosure before suing on the underlying obligation. *Christian v. Univ. Fed. Sav. Ass'n*, 792 S.W.2d 533, 535 (Tex. App.—Houston [1st Dist.] 1990, no writ). Where a guaranty agreement so provides, a lender need not liquidate its collateral before obtaining judgment against a guarantor. *Fed. Deposit Ins. Corp. v. Coleman*, 795 S.W.2d 706, 709-710 (Tex. 1990). CNB was not required to sell the rig and equipment or settle with the insurance company before filing an action against Smith.

3

*Did CNB Accept the Collateral in Full or Partial Satisfaction of the Debt?*

Smith argues that the stipulation and agreed order assigned title to the rig, equipment, and insurance claim to CNB as opposed to only transferring possession of the collateral to CNB. From this premise, Smith concludes that the assignment constituted full or partial satisfaction of the debt or an accord and satisfaction of the debt. Smith's conclusions do not necessarily follow from his premise.

The agreed order transferred title to CNB. Neither the stipulation nor the agreed order provided that CNB accepted the assignment of the collateral in satisfaction of Trans-Gulf's indebtedness to it. Nor was there any provision where CNB released Trans-Gulf or Smith from any claims CNB had against them. Further, Smith agreed in paragraphs 6 and 7 of his guaranty agreement that full or partial release of Trans-Gulf would not affect Smith's liability under the guaranty. Also, in paragraph 7, Smith waived all defenses other than discharge by payment in full, which would include the affirmative defense of accord and satisfaction.

Paragraph 6 of the guaranty agreement provided in part:

The liability of the Undersigned shall not be affected or impaired by any of the following acts or things (which Lender is expressly authorized to do, omit or suffer from time to time, both before and after revocation of this guaranty, without notice to or approval by the Undersigned): . . . (iv) any full or partial release of, settlement with, or agreement not to sue Borrower or any other guarantor or other person liable in respect of any Indebtedness, . . . (vii) any foreclosure or enforcement of any collateral security.

Paragraph 7 of the guaranty agreement set forth certain waivers by Smith:

The Undersigned waives any and all defenses, claims and discharges of Borrower, or any other obligor, pertaining to Indebtedness, except the defense of discharge by payment in full. Without limiting the generality of the foregoing, the Undersigned will not assert, plead, or enforce against Lender any defense of waiver, release, statute of limitations, res judicata, statute of frauds, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to Borrower or any other person liable in respect of any Indebtedness, or any setoff available against Lender to Borrower or any such other person. . . . The Undersigned expressly agrees that the Undersigned shall be and remain liable, to the fullest extent permitted by applicable law, for any deficiency remaining after foreclosure of any mortgage or security interest securing Indebtedness.

*CNB's Arguments on Waiver*

CNB argues that, in the guaranty agreement, Smith waived his arguments that there was acceptance of the collateral in full or partial satisfaction of the debt and that there was accord and satisfaction. To determine this question, we must analyze Smith's guaranty and the applicability of the Texas Uniform Commercial Code to the facts of this case.[1] We conclude that Smith's argument on appeal that there was full or partial satisfaction of the debt was not waived, although we ultimately conclude that the assignment did not constitute full or partial satisfaction. Smith's argument on accord and satisfaction was waived by his guaranty agreement.

*General Provisions of Chapter 9 of the Texas Business and Commerce Code*

Chapter 9 of the Texas Business and Commerce Code applies to any transaction that creates a security interest in personal property by contract. TEX. BUS. & COM. CODE ANN. § 9.109(a) (Vernon 2011). A guaranty agreement that is part of a transaction that creates a security interest is also governed by this chapter. *Rabinowitz v. Cadle Co. II, Inc.*, 993 S.W.2d 796, 799 (Tex. App.—Dallas 1999, pet. denied). Chapter 9 defines "collateral" as "the property subject to a security interest." Section 9.102(a)(12). A "debtor" is "a person having an interest, other than a security interest or other lien, in the collateral, whether or not the person is an obligor." Section 9.102(a)(28). An "obligor" is "a person that, with respect to an obligation secured by a security interest in . . . the collateral, (i) owes payment or other performance of the obligation, (ii) has provided property other than the collateral to secure payment or other performance of the obligation, or (iii) is otherwise accountable in whole or in part for payment or other performance of the obligation." Section 9.102(a)(60). A "secondary obligor" is "an obligor to the extent that: (A) the obligor's obligation is secondary; or (B) the obligor has a right of recourse with respect to an obligation secured by collateral against the debtor, another obligor, or property of either." Section 9.102(a)(72).

The comments to the Uniform Commercial Code further explain that a debtor has a property interest in the collateral. Section 9.102 cmt. 2a. A secondary obligor is a person who may have a stake in the proper enforcement of the security interest because of his obligation to pay a secured debt. *Id.* The general definition provision of the Texas Uniform Commercial Code defines "surety" to include "a guarantor or other secondary obligor." Section 1.201(b)(39) (Vernon 2009).

---

[1] The Texas Uniform Commercial Code is found in the Texas Business and Commerce Code. We will refer to it as the Texas UCC or the UCC.

It is undisputed that CNB had a security interest in the collateral and, thus, that Chapter 9 of the Texas Business and Commerce Code would apply. The guaranty agreement was part of the same transaction that created the security interest. Smith, as a guarantor, had an interest in the proper enforcement of the security interest as this would affect the amount of debt he ultimately would have to pay. Smith was a secondary obligor.

*Cases Involving Guaranties and the Uniform Commercial Code*

Some cases have emphasized a distinction between a situation where the guaranty was part of the same transaction that created the security interest held by the creditor and a situation where the guaranty guaranteed all borrowings of a debtor from a creditor. For a guaranty as part of the same transaction, see *Rabinowitz*, 993 S.W.2d 796, and *Coleman*, 795 S.W.2d at 709-10. For the guaranty of all borrowings, see *Federal Deposit Insurance Corp. v. Nobles*, 901 F.2d 477, 480 (5th Cir. 1990). For a case that discusses both situations, see *Royal Palm Senior Investors, LLC v. Carbon Capital II, Inc.*, No. 08 Cv. 4319(BSJ), 2009 WL 1941862 (S.D.N.Y. July 7, 2009).

CNB cites *Nobles*, where a guarantor argued that a guaranty agreement did not waive the statutory duty of good faith and the obligation to preserve collateral by perfecting a security interest. *Nobles*, 901 F.2d at 479-80. The court held that the guaranty agreement unambiguously waived this duty. *Id*. at 480. The guarantor also argued that the UCC prevented the duty of good faith from being waived by the guaranty agreement. *Id*. at 479. The court held that the UCC did not govern the guaranty agreement because the guaranty was separate and apart from the promissory note. *Id*. at 480. Therefore, general contract law applied, and under general contract law, waivers are valid and enforceable. *Id*.

Even if the UCC applied, however, the court in *Nobles* interpreted the guarantor's argument as being that he should be discharged from his obligations under the guaranty because the FDIC impaired the collateral securing the debt that he guaranteed. *Id*. The UCC provided that a "holder [the FDIC] discharges any party to the instrument to the extent that *without such party's consent* the holder . . . unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse." *Id*. at 480-81 (alterations in original). The court held that, even under the UCC, the waivers in the guaranty agreement constituted consent on the part of the guarantor to impair the collateral. *Id*. at 481.

In *Rabinowitz*, however, the Dallas Court of Appeals held that a guarantor was protected by the anti-waiver provision in the former version of Chapter 9 of the Texas Business and

6

Commerce Code. 993 S.W.2d 796. Rabinowitz, acting in his capacity as president of Southern States Enterprises, Inc., signed a promissory note to the order of Search National Bank. *Id*. at 798. Payment of the note was secured by collateral and by the unconditional guaranty of Rabinowitz. The guaranty agreement contained a waiver paragraph similar to paragraph 7 in the guaranty agreement signed by Smith.

Southern States defaulted on the note. *Id*. Search National Bank took possession of the collateral. The collateral was sold, and the proceeds were credited to the amount due under the note. Search National Bank became insolvent, and the note and guaranty were sold to Cadle. Cadle demanded that Rabinowitz pay the balance due under the note and guaranty, and Rabinowitz refused. Cadle sued Rabinowitz, and Rabinowitz argued that, because Search National Bank did not dispose of the collateral in a commercially reasonable manner, Cadle lost any right to recover the deficiency. At trial, Cadle relied on the waiver provisions in the guaranty, and the trial court entered judgment for Cadle.

The Dallas Court of Appeals in *Rabinowitz* first held that Chapter 9 of the Texas Business and Commerce Code applied to the guaranty because the guaranty existed only by virtue of a transaction in which the parties intended to create a security interest. *Id*. at 799 (quoting former Section 9.102 ("(a) Except as otherwise provided in Section 9.104 on excluded transactions, this chapter applies (1) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, or accounts.")). The court then noted that a guarantor was covered by former Section 9.501(c) (predecessor to the current Section 9.602), which prohibited waiver of a number of rights and duties under the chapter, including the duty of a creditor in possession of collateral to dispose of the collateral in a commercially reasonable manner. *Id*. at 799-800. Thus, the duty of commercial reasonableness could not be waived by the guarantor. *Id.* at 800.

*Nobles* can be distinguished from the case before us as it dealt with the alleged violation of good faith on the part of the creditor in failing to perfect a security interest in collateral and to satisfy part of the debt obligation from the disposition of collateral. 901 F.2d 477. The court in *Nobles* found that the guarantor had waived these complaints through waivers in his guaranty agreement. However, *Nobles* did not involve the anti-waiver provision in Chapter 9; it dealt with the general good faith provision in Chapter 1 of the UCC. Also, in deciding that the guaranty agreement was not covered by the UCC, *Nobles* did so under Chapter 3 of the UCC, which deals

7

with negotiable instruments. The application of Chapter 9, however, does not depend on whether an agreement is covered by Chapter 3.

Chapter 9 applies to "a transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract." Section 9.109(a)(1). Several of the provisions of Chapter 9 depend on a party's relationship to the security interest in order to become applicable. For instance, Section 9.602 applies to the rights granted to a debtor or obligor by certain sections of the chapter. Even if an agreement is not covered by Chapter 3, it might still be covered by Chapter 9. *See* Section 3.102(b) (Vernon 2002) (stating that, in the event of a conflict between Chapter 3 and Chapter 9, Chapter 9 governs).

*Rabinowitz* is closer to this case because *Rabinowitz* involved the anti-waiver provision in Chapter 9. In *Rabinowitz,* the issue was whether the guarantor had waived the creditor's duty to dispose of collateral in a commercially reasonable manner. Chapter 9 prevented this duty from being waived. *See* Section 9.602(7) (citing Section 9.610(b) ("Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms must be commercially reasonable.")). Likewise, pertinent to this case, Section 9.602 prevents waiver of the procedures in Sections 9.620, 9.621, and 9.622, involving acceptance of collateral in satisfaction of an obligation. A principal distinction between *Rabinowitz* and the case before us is that the parties in *Rabinowitz* stipulated that there was no evidence that the disposition was done in a commercially reasonable manner. *Rabinowitz*, 993 S.W.2d at 798. The parties in this case dispute whether an acceptance of collateral in satisfaction of the debt occurred.

The paragraphs in the guaranty were sufficient to waive Smith's common-law affirmative defense of accord and satisfaction. Accord and satisfaction is not listed in Section 9.602 as something a debtor or obligor may not waive. Although accord and satisfaction is not mentioned in the guaranty agreement, paragraph 7 provided that Smith waived "any and all defenses, claims and discharges of [Trans-Gulf], or any other obligor, pertaining to Indebtedness, except the defense of discharge by payment in full."

Section 9.602, however, prohibits waiver of Smith's argument that there was an acceptance of collateral in full or partial satisfaction of the obligation. Section 9.602(10) (relating to the waiver of rules from Sections 9.620, 9.621, and 9.622). Smith contends that the obligation has been fully or partially satisfied by the assignment in the agreed order and CNB's acceptance of the collateral. If Smith were correct, the obligation would have been reduced in the amount to the extent consented to by the debtor. *See* Section 9.622(a)(1). Smith, as a secondary obligor, is

8

entitled to place CNB's compliance with these provisions in issue. *See* Section 9.626(a). Smith, therefore, could not waive his argument under Chapter 9.

*Acceptance of Collateral in Full or Partial Satisfaction of Indebtedness*

Section 9.620 of the Texas UCC sets out the procedures by which a secured party can accept collateral in full or partial satisfaction of an obligation it secures. Section 9.620. A secured party may accept collateral in partial satisfaction of an obligation only if the debtor consents to the terms of the acceptance in a record authenticated after default. Section 9.620(a)(1), (c)(1). To be an effective acceptance of collateral, the secured party must consent to the acceptance in an authenticated record or send a proposal to the debtor. Section 9.620(b)(1).

In addition, a secured party may accept collateral in full satisfaction of an obligation only if the debtor agrees to the terms of the acceptance in a record authenticated after default or the secured party sends to the debtor a proposal proposing to accept the collateral in full satisfaction of the obligation it secures and the secured party does not receive a notification of objection authenticated by the debtor within twenty days after the proposal is sent. Section 9.620(a)(1), (c)(2). The secured party must also send a proposal of acceptance of collateral to any party that claims an interest in the collateral. Sections 9.620(a)(2), 9.621(a). A secured party's acceptance of collateral in full or partial satisfaction of the obligation it secures discharges the obligation to the extent consented to by the debtor. Section 9.622(a)(1).

An acceptance of collateral transfers all of a debtor's rights in the collateral to the secured party and terminates any subordinate interest in the collateral. Section 9.622(a)(2)-(4). A transfer of title to collateral to a secured party is not of itself a disposition of collateral and does not relieve the secured party of its duties under the UCC. Section 9.619(c). A secured party need not prove compliance with the provisions relating to collection, enforcement, disposition, or acceptance unless the debtor or a secondary obligor places the secured party's compliance in issue. Section 9.626(a)(1). A debtor or obligor may not waive or vary the rules set out in Sections 9.620, 9.621, 9.622, and 9.626. Section 9.602(10), (13).

Here, there was no indication in the stipulation or the agreed order that the parties intended the assignment of the collateral to constitute either full or partial satisfaction of the obligation secured by it. CNB did not consent to the assignment being an acceptance in full or partial satisfaction. At the time, the value of the collapsed rig and equipment was unknown, and the amount of possible insurance proceeds was unknown. Moreover, in general, a release of a claim must state the claim to be released. *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931,

938 (Tex. 1991). As no mention of the indebtedness was made in the stipulation or the agreed order, CNB's claims concerning the indebtedness were not released.

Smith argues that the rig, equipment, and insurance claim had to be valued as of the time of the assignment pursuant to the agreed order. We disagree. Smith cites *Hawkins v. Walker*, 233 S.W.3d 380, 392 (Tex. App.—Fort Worth 2007, pet. denied). The court in *Hawkins* was dealing with a fraud case and was referring to how damages are determined in a fraud case. *Hawkins* is not relevant. Chapter 9 of the Texas Business and Commerce Code is applicable to this case and provides the framework for determining the rights of Smith and CNB.

After default, a secured party may take possession of the collateral. Section 9.609(a)(1). As an alternative to an acceptance of the collateral under Section 9.620, a secured party may dispose of the collateral according to the procedures set out in Section 9.610. Section 9.610 provides as follows:

> (a) After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.

> (b) Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

Smith did not challenge the commercial reasonableness of CNB's disposition of the collateral.

After a disposition of the collateral under Section 9.610, the secured party shall apply the cash proceeds in the following order: (1) to the reasonable expenses associated with the disposition, (2) to the satisfaction of obligations secured by the security interest under which the disposition is made, (3) to the satisfaction of obligations secured by a subordinate security interest on the collateral, and (4) to a secured party that is a consignor of the collateral. Section 9.615(a). After applying the proceeds in this manner, any surplus is paid to the debtor. Section 9.615(d)(1). And the obligor is liable for any deficiency. Section 9.615(d)(2).

These provisions imply that a reduction of the amount of the debt obligation takes place after the secured party has disposed of the collateral. These provisions should be compared to where a secured party accepts collateral in full or partial satisfaction of the obligation, the debtor consents to that acceptance in accord with Section 9.620, and the obligation is discharged to the extent consented to by the debtor. Section 9.622(a)(1).

Smith argues that the collateral had to be valued at the time of the assignment to prevent a double recovery by CNB. This argument depends on Smith's characterization of the conveyance to CNB as an acceptance of the collateral in satisfaction of the obligation. However, an alternative characterization would be that this conveyance was in preparation of the disposition of the collateral under Section 9.610. *See* Section 9.619(c) (a transfer of title to collateral to a secured party is not of itself a disposition of collateral and does not relieve the secured party of its duties under the UCC). Under Section 9.615(d)(2) and paragraph 7 of his guaranty, Smith would be liable for any deficiency after the collateral was sold and the insurance proceeds were paid to CNB pursuant to the insurance settlement. There would be no double recovery.

Smith also argues that a valuation at the time of the assignment under the agreed order was necessary because the assignment extinguished statutory protections afforded to Smith. Smith mistakenly reasons that the assignment barred him from paying off the debt and redeeming the collateral. Smith also used this same argument to claim that there was an accord and satisfaction because Trans-Gulf and CNB had entered into a new agreement (the stipulation) for the disposition of the collateral that changed his rights (his statutory right of redemption was barred by the assignment) without including him in the process. That is not correct.

As a secondary obligor, Smith had the right to redeem collateral. Section 9.623. Redemption can occur at any time before a secured party (1) has collected collateral under Section 9.607 (the provision dealing with a secured party collecting payments from account debtors or any other person obligated on collateral); (2) has disposed of collateral or entered into a contract for its disposition under Section 9.610 (the provision allowing a secured party to sell, lease, license, or otherwise dispose of collateral in a commercially reasonable manner); or (3) has accepted collateral in full or partial satisfaction of the obligation it secures under Section 9.622. Section 9.623(c).

Again, Smith's argument that the conveyance deprived him of his statutory right of redemption depends on his characterization of the conveyance to CNB as an acceptance of collateral in full or partial satisfaction of the obligation. If the conveyance was not in satisfaction of the obligation, which we have held, he still had a right of redemption until CNB disposed of the collateral under Section 9.610.

Smith also made an argument that his was the only evidence as to the value of the rig and that the rig was valued at $5.1 million. That evidence was from an appraisal of the rig that was

made long before the rig collapsed. We found Smith's argument that the trial judge should have found that the value of the rig far exceeded CNB's debt difficult to understand.

*Constructive Strict Foreclosure*

Smith argues that, even though the stipulation and agreed order did not state that the assignment of the collateral was an acceptance in full or partial satisfaction of the underlying obligation, the fact that all of Trans-Gulf's ownership interests in the collateral were transferred amounted to an acceptance by CNB under Section 9.620. Smith attempts to draw a distinction between the case, as here, where title passes to the creditor and the case where only possession passes to the creditor. The matter is not that simple. In effect, Smith is asking this court to follow the doctrine of constructive strict foreclosure as represented by the case of *Tanenbaum v. Economics Laboratory, Inc.*, 628 S.W.2d 769, 771-72 (Tex. 1982), where the court held that the legislature in former Section 9.505(b) (the predecessor statute to Section 9.620) intended to put the creditor to an election to either sell the repossessed collateral or to retain the collateral in complete satisfaction of the debt.

In *Tanenbaum*, the creditor sued for a deficiency judgment following default on a secured note and repossession of the collateral. The creditor had sold equipment to debtor, retaining a security interest in the equipment. 628 S.W.2d at 770. The equipment did not work. *Id*. The debtor asked the creditor to take possession of the collateral and to credit his account in full. *Id*. The creditor took possession of the collateral and, after deciding that it would not be economically feasible to repair the equipment, scrapped it. *Id*. The creditor did not provide notice to debtor of this disposition. *Id*. For a creditor to dispose of collateral, notice had to be sent to the debtor. *Id*. Former Section 9.505(b) (predecessor to Section 9.620) read:

> [A] secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor if he has not signed after default a statement renouncing or modifying his rights under this subsection.

*Id.* at 771. The court held that the legislature intended to put the creditor to an election to either sell the repossessed collateral or to retain the collateral in complete satisfaction of the debt. *Id*. at 771-72. Because the creditor did not comply with the notice requirements upon its disposition of the collateral and because it destroyed the collateral, the court deemed the creditor as having elected to retain the collateral in full satisfaction of the obligation. *Id*. at 772. Thus, the creditor could not seek a deficiency judgment against the debtor. *Id*.

12

In *Cohen v. Rains*, 769 S.W.2d 380, 381 (Tex. App.—Fort Worth 1989, writ denied), the creditor appealed a judgment denying him the balance due on a promissory note and foreclosure of his security interest in 80,000 shares of common stock of debtors' corporation because of a finding that he had exercised ownership rights in the collateral. The debtors had defaulted on their obligation. *Id*. at 382. Pursuant to the creditor's request, the debtors mailed the four stock certificates representing the 80,000 shares of stock in which the creditor had a security interest to creditor's attorney. *Id*. The creditor never endorsed these certificates. *Id*. Before judicial foreclosure and after giving notice to debtors, the creditor voted the shares of stock. *Id*. at 383.

At trial, the debtors in *Cohen* argued that the security agreement did not allow the creditor to vote the shares of stock before foreclosure. *Id*. They argued that, when the creditor notified them that he had voted the shares of stock, he accepted the stock in full satisfaction of the obligation and was precluded from suing for any deficiency. *Id*. The jury found that he had exercised ownership rights in the collateral, and the trial court held that this amounted to an acceptance of the collateral in full satisfaction of the debt. *Id*. at 381.

The court of appeals in *Cohen* noted that the concept of "involuntary strict foreclosure" had never specifically been addressed in Texas. *Id*. at 386. It observed that one approach taken by some states had been to hold that it was impossible to retain collateral in satisfaction of an obligation without actual service of notice on the debtor of the secured party's intent to retain the collateral in payment of the debt. *Id*. A second approach was to imply retention in satisfaction of the obligation from an unreasonably prolonged retention of the collateral by the secured party, which was a question of fact. *Id*. A third approach looked to whether the secured party's actions manifested an intent to retain the collateral in satisfaction of the obligation. *Id*.

After examining *Tanenbaum*, the *Cohen* court determined that Texas did not follow the first approach, which required that the debtor be notified of retention of collateral in satisfaction of an obligation. *Id*. However, *Tanenbaum* left undecided which of the remaining two approaches was the law in Texas. *Id*. at 388. The court was of the opinion that the right to vote stock is one incident of ownership but that the exercise of ownership rights was not synonymous with retention. *Id*. Thus, it was improper to submit the question to the jury: "Did Plaintiff . . . intend to, and did he, exercise the same or similar rights of ownership with regard to the 80,000 shares of common stock . . . which a third party would have usually exercised if the stock had been owned by such a third party, other than Plaintiff or Defendants?" *Id*. at 383-84, 388. This

13

question did not resemble either of the two approaches left open by *Tanenbaum*. *Id.* at 388. The court reversed and remanded. *Id*. at 393.

*The Current Statute*

The current statute, Section 9.620, resolves some of the difficulties raised by *Tanenbaum* and *Cohen*. The former statute, as quoted in *Tanenbaum*, stated that a secured party in possession of collateral may propose to retain the collateral in satisfaction of the obligation. *Tanenbaum*, 628 S.W.2d at 771. Section 9.620 allows a secured party to accept collateral in full or partial satisfaction *only if* the procedures set out are complied with. These procedures include sending proposals of acceptance to various interested parties under Section 9.621 and having the creditor either consent to the terms of the acceptance (which presumably would include some mention of the fact that the acceptance is in full or partial satisfaction of the obligation) or fail to reply to a proposal setting out the terms of the acceptance. Section 9.620.

The comments to Section 9.620 reveal that it was meant to do away with the doctrine of constructive strict foreclosure, as represented by *Tanenbaum*, by requiring the secured party's authentication to the terms of acceptance. "[D]elay is a factor relating to whether the secured party acted in a commercially reasonable manner for purposes of Section 9-607 or 9-610." Section 9.620 cmt. 5.

Here, there was no indication in the stipulation or the agreed order that one of the terms of the conveyance was that CNB was accepting the collateral in full or partial satisfaction of the obligation. In general, a release of a claim must state the claim to be released. *Brady*, 811 S.W.2d 931. There was no mention in the stipulation or the agreed order that CNB was releasing its claims against Trans-Gulf or Smith; therefore, CNB's claim as to the indebtedness was not released.

Although neither the parties nor this court found a Texas case directly in point, we agree with CNB that *Royal Palm*, 2009 WL 1941862, involved a similar set of facts and is authority in support of our conclusion that the stipulation and agreed order did not constitute an acceptance of the collateral by CNB that was in full or partial satisfaction of Trans-Gulf's or Smith's obligations. Although Smith attempts to distinguish *Royal Palm* by arguing that only possession of the collateral was transferred to the creditor, Carbon Capital, it is clear from the opinion that the debtor assigned all its rights in the collateral to Carbon Capital just as Trans-Gulf did in this case.

After the debtor, Royal Palm Senior Investors, LLC (RPSI), first defaulted, Carbon Capital demanded full payment from the guarantor. The parties entered into a settlement agreement that gave RPSI an extension on the debt repayment date and provided that, if RPSI failed to pay the outstanding debt, sell the hotel, or refinance the loan by the new date, the collateral (Membership Interests) would be automatically conveyed to Carbon Capital. When RPSI failed to perform, Carbon Capital requested and RPSI tendered an assignment and transfer of all the Membership Interests, after which Carbon Capital "became owner and managing member of the Hotel." In the present case, Smith fails to acknowledge that "possession" may be transferred with or without title passing.

The *Royal Palm* court pointed out that, once a creditor takes possession of the collateral, the creditor has three options after default: (1) the secured party may sue on the note itself (N.Y. U.C.C. Section 9-601(a)(1)); (2) the secured party "*may* accept collateral in full or partial satisfaction of the obligation it secures" pursuant to N.Y. U.C.C. Section 9-620(a); or (3) the secured creditor "may sell, lease, license, or otherwise dispose of any or all of the collateral" by a "commercially reasonable" public or private proceeding (N.Y. U.C.C. Section 9-610(a)). 2009 WL 1941862, at *3-4. In finding that Carbon Capital had declined the second remedy (as in this case), the court stated:

> In fact, courts have declined to apply this remedy when the secured creditor, wishing [Section 9-620] not to apply, did not fulfill its procedural prerequisites. Since it is undisputed that the Settlement Agreement did not set forth any terms by which Carbon Capital would accept the collateral in satisfaction of the debt and Carbon Capital did not send written notice of any intention to do so, the Court declines to apply this remedy.

*Royal Palm*, 2009 WL 1941862, at *3 (citations omitted). The court in *Royal Palm* quoted comment 5: A "secured party's acceptance of possession of the collateral does not, of itself, necessarily raise an implication that the secured party intends or is proposing to accept the collateral in satisfaction of the secured obligation." *Id.* In the case before this court, there is no evidence that CNB wanted Section 9.620 to apply.

CNB's actions indicate that it chose the third option: a secured creditor "may sell, lease, license, or otherwise dispose of any or all of the collateral" by a "commercially reasonable" public or private proceeding. Section 9.610(a). Smith made no claim that the disposal of the collateral by CNB was not commercially reasonable. Therefore, it is too late for Smith to

15

challenge the insurance settlement or the amount that CNB received for the impaired rig and equipment.

We hold that CNB did not accept the collateral in full or partial satisfaction of Trans-Gulf's indebtedness. Smith's first issue is overruled.

*Accord and Satisfaction*

We noted earlier that Smith in paragraph 7 of his guaranty waived the affirmative defense of accord and satisfaction. There is an additional reason why Smith has not proved an accord and satisfaction.

To prevail under common law on the affirmative defense of accord and satisfaction, there must be (1) evidence of a dispute between Trans-Gulf (or Smith) and CNB and (2) evidence establishing that it and CNB specifically and intentionally agreed to discharge Smith's obligations. *Milton M. Cooke Co. v. First Bank & Trust*, 290 S.W.3d 297, 304 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

In *Jenkins v. Henry C. Beck Co.*, 449 S.W.2d 454, 455 (Tex. 1969), the supreme court held that the defense of accord and satisfaction rests on a new contract, express or implied, in which the parties agree to the discharge of the existing obligation by means of a lesser payment tendered and accepted. But the supreme court made it clear that there must be an unmistakable communication to the creditor that the tender is made on the condition that acceptance will constitute satisfaction of the underlying obligation, and the statement accompanying the tender must be so clear, full, and explicit that it is not susceptible of any other interpretation. *Id.* at 455.

As with Smith's argument that CNB accepted the collateral in full or partial satisfaction of the obligation, his argument on accord and satisfaction fails because there is no evidence that Trans-Gulf and CNB specifically and intentionally agreed to discharge Trans-Gulf's obligation. Smith's third issue is overruled.

*Summary*

It did not matter whether title passed, or only possession, of the collateral under the stipulation and agreed order. What mattered is that the stipulation and agreed order did not clearly state that CNB accepted the collateral in full or partial satisfaction of Trans-Gulf's debt. Nor was there any indication that Trans-Gulf, the debtor, agreed to the acceptance being in full or partial satisfaction. The requirements of Section 9.620 were not followed.

Smith in his guaranty waived the affirmative defense of accord and satisfaction. Moreover, the stipulation and agreed order contained no "unmistakable communication" to CNB

16

that the tender of the collateral was made "upon the condition that acceptance [would] constitute satisfaction of the underlying obligation." *See Jenkins*, 449 S.W.2d at 455.

Although the stipulation and agreed order did not follow the requirements of Section 9.620 for a full or partial satisfaction of Trans-Gulf's debt, CNB has stated that it did sell the rig and equipment and that it did receive proceeds from a settlement of the insurance claim. Under paragraph 7 of his guaranty, Smith agreed to remain liable for any deficiency remaining after foreclosure of the security interest securing Trans-Gulf's indebtedness. Section 9.615 is also authority for Smith being liable for any deficiency after CNB's disposition of the collateral. The summary judgment evidence raised an issue of material fact regarding the amount of credit due to Smith. On remand, to determine the credit due Smith, the trial court need only determine the amount received by CNB in the insurance settlement, the amount from the sale of the rig and equipment, and the amount of CNB's related expenses in dealing with the collateral.

### This Court's Ruling

The trial court's judgment is affirmed in part and reversed in part. That portion of the judgment awarding damages to Community National Bank is reversed, and the cause is remanded to the trial court for a recalculation of damages, giving C. Kyle Smith credit due to him consistent with this opinion. In all other respects, the judgment of the trial court is affirmed.


TERRY McCALL

JUSTICE


June 16, 2011

Panel[2] consists of: Wright, C.J., McCall, J., and Hill, J.[3]

---

[2]Rick Strange, Justice, resigned effective April 17, 2011. The justice position is vacant pending appointment of a successor by the governor.

[3]John G. Hill, Former Justice, Court of Appeals, 2nd District of Texas at Fort Worth, sitting by assignment.